CHARLES D. NORVILLE *et al.*, Plaintiffs-Appellants, *v.* ALTON BIGTOP RESTAURANT, INC., *et al.*, Defendants-Appellees.

(No. 72-226;

Fifth District—September 25, 1974.

274

Steve A. Maragides, of Granite City, for appellants.

Harry J. Sterling, of Belleville, and Hamilton C. Jones, of Herrin, for appellees.

Mr. PRESIDING JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiffs appeal from a judgment of the trial court of Madison County wherein the court, sitting without a jury, held that the plaintiffs (appellants herein) were not entitled to rescind the sale of certain securities and thus could not recover the purchase price of the securities, togther with interest and attorney fees. The trial court granted defendant's motion for a directed verdict as to some plaintiffs and entered judgment in favor of all named defendants and against all named plaintiffs, holding that statements made to induce the sales were mere "puffing."

Appellants have raised two issues on appeal. First, appellants contend that statements made by the individual defendants on behalf of the various corporations were untrue statements of material fact in violation of section 12G of the Illinois Securities Act of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137—12G); second, appellants maintain that the sales of securities made by defendants were voidable under section 12A (Ill. Rev. Stat. 1973, ch. 121½, par. 137.12A), for failure to register the securities with the Secretary of State pursuant to section 5 of the Act (Ill. Rev. Stat. 1973, ch. 121½, par. 137.5).

During the course of the trial, appellants Charles Norville and Carl

House testified that early in 1967 they talked with defendants Carman and Shearburn about buying stock in the proposed Alton Bigtop Restaurant. Mr. Norville testified that Shearburn stated that "the amount of interest that would be paid would be 15% to be paid quarterly" for a period not to exceed 3 years until the company went into operation. Norville paid $5500 for stock but received only five dividend checks. House testified that Shearburn and Carman told him that he "would get 15% or at the end of a three year period or prior to that (he) would get 5% of the gross," whichever totaled more. House paid $5500 for Bigtop stock but received only five dividend checks.

Appellant Fred King's testimony was essentially the same as that of Norville and House.

Appellant Denver McCollum testified that he invested $5500 in the proposed Alton Bigtop as the consequence of Shearburn's representations that he "would be paid 15% interest for three years until the restaurant was built," after which time he would receive dividends according to the net profits. After McCollum stopped receiving his quarterly checks, he complained to defendant Jones who stated that he felt that it was a mistake to have made the agreement to pay 15% dividends.

> "He said that he felt that they should not have made the agreement to pay the 15% dividends that [they] were under capitalized to handle this sort of return. It was a mistake that they said they would pay the people 15% dividends."

He also testified that "they" meant the corporation, Carman, Jones and Shearburn and that in his conversations with Jones all the names were mentioned.

Odie Nichols testified that in February or March 1967 he spoke with Carman and Shearburn about buying stock in the Bethalto and Wood River Bigtop Restaurants. Shearburn and Carman told Nichols that he

> "* * * would draw 15% to be paid quarterly for three years and at the end of three years (he) would have most of [his] money back in dividends and after that [he] would draw according to what the restaurants made. They said it may be 8% or might even run up to 20% according to how much they sold."

Nichols invested in both the Wood River and Bethalto Bigtop Restaurants and his dividends were discontinued after a few quarters.

Appellant Alma Hillier testified that she and her husband invested in the Wood River and Bethalto restaurants after meeting with Shearburn and Carman. Either Shearburn or Carman told the Hilliers that "if [they] bought shares * * * that [they] would receive 15% for the first three years," and that "after three years [they] would receive a

certain amount for whatever the profits were." Mrs. Hillier stated that the words "promised" or "guaranteed" were never used, although she did emphasize that no conditions were attached to the 15% return. Dividends were discontinued after a few payments, although the few dividend checks that Mrs. Hillier did receive amounted to a 15% return on her investment at the time.

Charles Schoeneweis testified that in early 1967 he talked with Carman and Hamilton Jones about investing in the proposed chain of Bigtop Restaurants. He testified that he attended a public meeting at Jones's office at which both Jones and Carman were present. Jones presented the proposed operation and explained that stockholders would receive 15% dividends for 3 years after which time the restaurant would be in operation and stockholders would share the net profits. Subsequently, Carman and a Victor Green presented drawings and plans of the Bethalto restaurant at Schoeneweis's home. Because Schoeneweis did not have enough cash at the time, he borrowed $5500 at 6% interest from Jones to invest in the Bethalto Bigtop. Schoeneweis testified that no conditions were attached to the 15% dividends.

Appellant William Camp testified that he purchased shares of stock in the Bethalto Bigtop after Shearburn and Carman stated that he would receive a 15% return on his investment for a 3-year period. He testified that he received two quarterly payments after which time dividends were discontinued.

Appellant Paul Slaughter testified that early in 1967 he was approached by Bruce Carman who asked him to invest $15,000 in Bigtop stock. Slaughter rejected the proposal, but a short time later was again approached by Carman who told him that for a $5500 investment he would receive 15% interest or 5% of the profits, whichever was greater. Jones also guaranteed the greater of 15% interest or 5% of the profits for 3 years and promised to buy back the stock after 3 years if Slaughter were not satisfied.

Appellant Rebecca Lyford testified that in May 1967 she talked to Carman about investing in Bigtop stock. Carman presented the plans of the proposed operation and told her that she "would get 15% for three years and after that * * * [she] would get a share of the whole stock of the place." Ms. Lyford testified that Carman described no conditions.

Appellant Marion Bruns testified that she first heard about the proposed chain of restaurants through Victor Green, a personal friend, who drove her to Jones's office where they discussed investing in Bigtop stock. Both Jones and Green told Ms. Bruns that she "would receive 15%

quarterly on the investment" for 3 years. Ms. Bruns decided to invest in the Wood River Restaurant and wrote a personal check which was payable to Jones, but never received any dividends.

Shearburn testified that as salesman for the Bigtop stock, he told certain plaintiffs that they would receive a 15% return to be paid quarterly for 3 years until the restaurants were in operation. He further stated that Carman instructed him on the 15% dividend rate and that he never told appellants about any conditions on the 15%. After receiving checks from some of the appellants, Shearburn turned the funds over to Carman or Jones, whichever was available.

■■ The aforesaid statements were untrue statements of material fact or they involved omissions of material fact, *i.e.*, any conditions attached to the 15% which should have been included to make the statements not misleading under the circumstances. They were not mere "puffing" as the trial court held.

Nearly all State securities statutes have anti-fraud provisions and require registration of securities and most require registration of dealers and brokers. (11 Vand. L. Rev. 659 (1958).) Since the Illinois law provides for all three, it has been characterized as a paternalistic type of Blue Sky Law. Young, History, Source, and Effect of the Illinois Securities Act of 1953, as Amended, S.H.A., ch. 121½, appendix at 576 (1960).

■■ Most State provisions are broader in scope than their Federal counterparts. (Loss, Blue Sky Law, at 3 (1958).) Generally, the theory behind State securities provisions is paternalism; the State administrator may refuse registration when he doubts the soundness of a particular securities issue even though the issuers will disclose all material facts to the investing public. By way of contrast, the Federal anti-fraud provisions embody a disclosure philosophy; issuers must provide the investor with adequate information so that he can exercise his own judgment. 11 Vand. L. Rev. 659 (1958). See also Young, History, Source, and Effect of the Illinois Securities Act of 1953, as Amended, S.H.A. ch. 121½, appendix at pp. 574-75 (1960).

■■ Most State securities laws were enacted long before Congress adopted the Securities Act of 1933 and, consequently, definitions in the State provisions strongly influenced their Federal counterparts. Nonetheless, Mr. Young remarks in his interpretive comments that since 1933 the Federal securities provisions have strongly influenced definitions in and enforcement of their State counterparts. For example, under both Illinois and Federal law the definition of "security" does not cover those schemes in which money is invested in a common enterprise. (*Polikoff v. Levy*, 55 Ill.App.2d 229, 204 N.E.2d 807.) Indeed, almost all definitions in the

Illinois Securities Act of 1953 were based on similar provisions in the Federal Securities Act of 1933 and its registration provisions and requirements emulate similar provisions in the 1933 Act. One commentator notes that the Illinois registration rules are modeled so closely after the Securities Exchange Commission (SEC) rules that in practical effect they are the same. 49 Nw.U.L.Rev., at 781 (1955).

Young notes that the anti-fraud provisions of section 12G of the Illinois Securities Act of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.12G) were patterned after section 17 of the Federal Securities Act of 1933 (15 U.S.C. par. 77q) which provides, generally, that it is unlawful to offer or sell securities in interstate commerce by fraudulent means and misleading statements. Section 12G of the Illinois Securities Act provides:

"It shall be a violation of the provisions of this Act for any person:

A. To sell any security except in accordance with the provisions of this Act:

\* \* \*

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." (Ill. Rev. Stat. 1973, ch. 121½, par. 137.12G and A.)

The Federal counterpart provides in pertinent part:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

\* \* \*

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, \* \* \*." 15 U.S.C., par. 77(q) (1970).

It is also important to note that the language of section 12 of the Illinois Securities Act and section 17(a) of the Federal Securities Act of 1933 closely parallels SEC Rule 10b-5 which in pertinent part reads:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, \* \* \*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, * * *." (17 C.F.R., par. 240. 10b—5 (1973).)

Except for the interstate elements in Rule 10b—5, section 12 of the Illinois Securities Act cover the same violations. As to remedies, Rule 10b—5, unlike its Illinois counterpart and section 17(a), provides a remedy for the seller as well as the buyer. *Parrent v. Midwest Rug Mills, Inc.* (7th Cir. 1972), 455 F.2d 123, 126 n. 7, 127; 1970 U. Ill. L.F. 296.

Moreover, Rule 10b—5 and the Illinois Act share similar purposes. It is a well-established principle that the objective of the Illinois Securities Act is to protect innocent investors who are induced to invest in highly speculative securities. (*Reid v. NX Corp.* (1973), 11 Ill.App.3d 706, 297 N.E.2d 380; *Silverman v. Chicago Ramada Inn, Inc.* (1965), 63 Ill.App.2d 96, 211 N.E.2d 596; *Meihsner v. Runyon* (1960), 23 Ill.App.2d 446, 163 N.E.2d 236.) Similarly, SEC Rule 10b—5 protects the uninformed, the ignorant, and the gullible. *Surowitz v. Hilton Hotels Corp.* (7th Cir. 1965), 342 F.2d 596, 602.

■■ From the preceding analysis it is clear that a discussion of the pertinent Federal law will be helpful in determining whether statements made by the defendants in connection with dividend rates of Bigtop stock were untrue statements of material fact under Illinois law. Defendants contend in this appeal that the trial court correctly held that their statements were mere "puffing" or sales talk. A brief history of the origin and application of the concept of "puffing" will shed some light on this question.

The concept of "puffing" is derived from the doctrine of caveat emptor and was associated with the common-law actions of fraud and deceit. It arose primarily in the context of the sale of tangible goods in which examination by the purchaser was expected to counteract the persuasive effect of the salesman's exaggerated statements. (See *In re B. Fennekohl & Co.* (1962), 41 S.E.C. 210; VI Loss, Securities Regulations, at 3541 (supp. to 2d ed. 1969).) In the early days of securities regulation the privilege to puff excused a good deal of misleading and exaggerated sales talk. The privilege often excused glowing predictions in the sale of mining stock. See, *e.g.*, *S.E.C. v. Gold Hub Mines Co.*, (D. Colo. 1939), 1 S.E.C. 634, 635; *S.E.C. v. McDowell Mines, Inc.* (D. Colo. 1937), 1 S.E.C. 376, 377; *Burwash v. Ballou* (1907), 230 Ill. 34, 82 N.E. 355; *Stalnaker v. Janes* (1910), 68 W.Va. 176, 69 S.E. 651. See also *Los Angeles Trust Deed & Mortgage Exchange v. S.E.C.* (9th Cir. 1959), 264 F.2d 199, 209.

■■■ At common law statements relating to future dividends, earnings, or expected profits which were made to induce the public to purchase corporate stock were privileged statements on which the public had no right to rely. Rescission was unavailable even if such statements were false when made. (2 Black, A Treatise on the Rescission of Contracts and Cancellation of Written Instruments, at 957 (2d ed. 1929).) For example, in *Farmers' Loan & Mortgage Co. v. Langley* (1928), 166 La. 251, 117 So. 137, 140, a statement by an agent that his company "would pay" 15% per annum in dividends was described as a mere expression of opinion or confidence; *accord, Zeh v. Alameda Community Hotel Corp.* (1932), 122 Cal. App. 366, 10 P.2d 190.

However, recent authorities are unanimous in condemning the concept of "puffing" in the context of securities regulations. Loss, in his treatise, remarks that there is no longer much room for drawing the thin line between "puffing" and misrepresentation. (VI Loss, *supra*, at 3541.) In *S.E.C. v. Capital Gains Research Bureau, Inc.* (1963), 375 U.S. 180, 194, 11 L.Ed.2d 237, 248, 84 S.Ct. 275, the Supreme Court noted that:

> "There has * * * been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue."

■■■ A fundamental objective of the Federal Securities Act is to substitute a philosophy of full disclosure for one of caveat emptor and to thereby protect the investing public against the sharp practices of promoters whether or not such practices meet the requirements of common-law fraud. (*S.E.C. v. Capital Gains Research Bureau* (1963), 375 U.S. 180, 186, 11 L.Ed.2d 237, 243, 84 S.Ct. 275; *In re Aircraft Dynamics International Corp.* (1963), 41 S.E.C. 566, 570. See also *Lerman v. Tenney* (S.D.N.Y. 1969), 295 F.Supp. 780.) Similarly, it is apparent that the Illinois legislature by adopting a paternalistic scheme of securities regulation intended to remove caveat emptor from securities sales. Hence, the statutory right to rescind under section 12G is not dependent on the purchaser's ability to prove common-law fraud. (*Mark v. McDonnell & Co.* (7th Cir. 1971), 447 F.2d 847.) To speak of "puffing" here, then, is an anomaly.

There is a growing recognition in the SEC and among the lower Federal courts that specific predictions of price increases or dividends are, in certain circumstances, actionable under Federal and State securities provisions. It is immaterial, then, whether the statements involved in this appeal are to be characterized as "fact" or as "opinion." For

example, in *In re Aircraft Dynamics International Corp.* (1973), 41 S.E.C. 566, securities salesmen represented to customers that dividends would be paid after a short time and that the stock would dramatically increase in value. The Commission rejected the salesmen's assertion that their statements were mere opinion or "puffing" sales talk that one expects from any salesman. *In re Associated Investors Securities, Inc.* (1962), 41 S.E.C. 160, involved literature containing statements that the company guaranteed dividends of not less than 5% for the first year and not less than 6%, 7%, 8% and 10% in the 4 succeeding years. The SEC ruled that these representations carried a materially false implication that the company would earn increasing profits during the years which would be sufficient to justify the dividends. See also *Holmes v. United States* (8th Cir. 1943), 134 F.2d 125 (representation that prospective purchasers would receive interest as provided by the terms of the securities); *Green v. Jonhop* (D. Ore. 1973), 358 F.Supp. 413 (200% overstatement of projected earnings in a report which also recommended purchase of corporate stock); *S.E.C. v. Hoffenden-Rimar International, Inc.* (E.D. Va. 1973), 362 F.Supp. 323 (statement that investment in Scotch whiskey was safe and would provide an annual 20-25% profit when in fact this investment was highly speculative).

■■ As a general rule, statements of opinion which have a firm historical or factual basis are not actionable. (*G. & M., Inc. v. Newbern* (9th Cir. 1973), 488 F.2d 742.) But unfounded predictions of future performance are impermissible under both Illinois and Federal antifraud provisions. (*Rotstein v. Reynolds & Co.* (N.D. Ill. 1973), 359 F.Supp. 109; *S.E.C. v. Broadwall Securities, Inc.* (S.D.N.Y. 1965), 240 F.Supp. 962; *In re Associated Investors Securities* (1962), 41 S.E.C. 160.) Shearburn concedes in his brief that the Bigtop Restaurants were "new entities with no established market, no assets, and no basis upon which to reasonably calculate a return." To either promise or predict an unusually high 15% rate of return on stock in a chain of restaurants which had yet to start business was clearly unjustified. (See *In re Thomas Bond, Inc.* (1939), 5 S.E.C. 60, 71.) " '* * * Representations as to value, soundness and worth of securities may go so far beyond what may be considered the proper limits of the exaggerated enthusiasm of the normal salesman, or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud * * *.' " *S.E.C. v. Franklin Atlas Corp.* (S.D.N.Y. 1957), 154 F.Supp. 395, 400; *accord, Holmes v. United States* (8th Cir. 1943), 134 F.2d 125, 133; *S.E.C. v. North American Research & Development Corp.* (S.D.N.Y. 1968), 280 F.Supp. 106, 132.

If there were, in fact, any preconditions to payment of the full amount of the dividends, apparently none were stated to the plaintiffs. Half-truths, material omissions, misleading statements, and deliberate false-hoods in connection with the sale of securities are equally unlawful. *Kubik v. Goldfield* (3d Cir. 1973), 479 F.2d 472, 476; *S.E.C. v. Hof-fenden-Rimar International, Inc.* (E.D.Va. 1973), 362 F.Supp. 323, 327.

The only question remaining, then, is whether misrepresenting the proposed scheme of dividend payments was material. The Federal courts have generally adopted the common-law definition of materiality as it is enunciated in the Restatement of Torts:

> "A fact is material if (a) its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question, or (b) the maker of the representation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it." (Restatement of Torts, par. 538 (1934).)

(See, *e.g., S.E.C. v. Texas Gulf Sulphur Co.* (2d Cir. 1968), 401 F.2d 833 (en banc); *Branham v. Material Systems Corp.* (S.D.Fla. 1973), 354 F.Supp. 1048; *S.E.C. v. M. A. Lundy Associates* (D.R.I. 1973), 362 F.Supp. 226.) It is to be expected that disclosure of dividend rates or of any preconditions to their full realization may affect the desire of investors to buy, sell, or hold corporate securities. The record shows that the 15% rate of return on Bigtop stock was, in fact, the chief reason for plaintiffs' decision to invest. While mere opinion or expression of the seller's views on a future situation is not actionable under the Act, an expression of opinion, which is coupled with other statements, may be a statement of material fact even if it is framed technically to be a mere opinion. (*S.E.C. v. Macon* (D. Colo. 1939), 28 F.Supp. 127.) In the instant case the record shows that defendants' statements were framed to convey the impression that the 15% rate of return was guaranteed even though the words "guaranteed" or "promised" were apparently never used.

Defendants also contend that plaintiffs did not plead or prove at trial that they notified defendant of their election to rescind the sales of Bigtop stock as required by section 13B of the Illinois Securities Act of 1953, which in pertinent part reads:

> "Notice of any election provided for in Sub-section A of this section shall be given by the purchaser, within 6 months after the purchaser shall have knowledge that the sale of the securities to him is voidable, to each person from whom recovery will be sought, by registered letter addressed to the person to be notified

at his last known address with proper postage affixed, or by personal service; * * *." Ill. Rev. Stat. 1973, ch. 121½, par. 137.13B.

In *Burkhart v. Allson Realty Trust* (N.D.Ill. 1973), 363 F.Supp. 1286, and in *Jordan Building Corp. v. Doyle, O'Connor & Co.* (N.D.Ill. 1967), 282 F.Supp. 87, plaintiffs' actions under the antifraud provisions of the Securities Act of 1953 were dismissed for failure to plead that notification was sent to the defendants within 6 months from the date when plaintiffs had knowledge that the sales were voidable. However, both in *Burkhart* and in *Jordan Building* it is unclear whether the court would require a separate notice of election to rescind other than the complaint itself. In the instant case, plaintiffs specifically stated in their complaint that by filing suit they elected to void the sales of Bigtop securities and that less than 6 months had elapsed between the time they acquired knowledge that the sales were voidable and the time of filing suit. There is nothing in *Burkhart* or in *Jordan Building* to indicate that a complaint with sufficiently specific allegations may not also serve as a notice of an election to void the sale of securities. The Illinois Securities Act is paternalistic in character and therefore its provisions should be liberally construed to protect the investing public from fraud and deceit in the sales of securities. *Silverman v. Chicago Ramada Inn* (1965), 63 Ill. App.2d 96, 211 N.E.2d 596, 598; *Stein v. Twilight Motel, Inc.* (1961), 29 Ill.App.2d 131, 172 N.E.2d 642; *Meihsner v. Runyon* (1960), 23 Ill. App.2d 446, 456, 163 N.E.2d 236.

■■ Young in his interpretive comments notes that the purpose of section 13B is to cut down the liability period, especially with respect to inadvertent violations of the Act and to thus prevent purchasers from waiting the entire statute of limitations to decide whether to elect rescission. In the instant case the record shows that summons and copies of plaintiffs' complaint were served personally on defendants Jones and Shearburn on March 24, 1970, within 6 months of the dates on which plaintiffs first acquired knowledge from their attorney that the sales of Bigtop stock were voidable.

■■ The record also shows that Carman filed a motion to dismiss plaintiff's complaint on April 27, 1970. Thus it is to be presumed that he had previously received notice. Personal service of summons and complaint appears sufficient to satisfy the notice requirements of section 13B under a liberal reading of the statute. This result is not inconsistent with the purpose of the provisions particularly since there is no contention here that defendants' defense was hampered or prejudiced by plaintiffs' failure to send a separate notice of their election to the sales of Bigtop stock.

Defendants also contend that the appellants did not establish a date on which they acquired knowledge that the sale was voidable and thus they did not prove that they met the statutory requirements of notifying the seller of their intention to void the sale within 6 months of gaining knowledge that the sale was voidable. The undisputed testimony of the appellants was that none of them had any knowledge that these sales were voidable under the Illinois Securities Law until they contacted their attorney in early 1970. In *Curtis v. Johnson* (1968), 92 Ill.App.2d 141, 234 N.E.2d 566, the court stated that knowledge that a sale is voidable is a mixed question of fact and law on which a layman is entitled to acquire his first knowledge from an attorney. Having received knowledge that the sale was voidable, the appellants, through their attorney, filed suit on March 16, 1970. The defendants have introduced no testimony that would lead to a different conclusion and thus it appears that the appellants did notify the defendants of their election within the required 6 months.

■■ Section 13A of the Illinois Securities Act of 1953 provides that each underwriter, dealer, salesman, corporate officer and corporate director who participates or aids in any way in making a sale of securities in violation of the Act is jointly and severally liable for the purchase price, together with interest and reasonable attorney fees. (Ill. Rev. Stat. 1973, ch. 121½, par. 137.13A.) Jones signed the stock certificates as president of the three Bigtop corporations, conducted a public meeting at which the public was encouraged to invest in Bigtop stock, on one occasion made a personal loan to facilitate the purchase of stock, received plaintiffs' checks from Shearburn and on two occasions personally solicited sales. He also instructed Shearburn regarding the dividend rates, received purchasers' checks, and served as secretary of the three Bigtop corporations. As promoters, both Jones and Carman are liable on all counts.

Shearburn, as salesman for the Bigtop securities, personally solicited the purchase of Bigtop stock on numerous occasions. Since he was not named as a defendant in Counts VII, IX, X or XI, he is liable only to plaintiffs Charles Norville, Carl House, Fred King, Denver McCollum, Odie Nichols, Alma Hillier and William Camp.

■■ Alton Bigtop Restaurant, Inc., Bethalto Bigtop Restaurant, Inc., and Wood River Bigtop Restaurant, Inc., are liable as issuers in all counts. Since defendant Restaurant Associates, Inc., owns 60% of the stock in each of the three Bigtop Corporations, it is liable as a controlling person in all counts.

For the foregoing reasons, the judgment of the trial court of Madison

County is reversed and this case is remanded with directions to enter judgment as follows:

On Count I, in favor of appellant Charles Norville and against defendants Jones, Shearburn, Carman, Alton Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count II, in favor of appellant Carl House and against defendants Jones, Shearburn, Carman, Alton Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count III, in favor of appellant Fred King and against defendants Jones, Carman, Shearburn, Alton Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count IV, in favor of appellant Denver McCollum and against defendants Jones, Shearburn, Carman, Alton Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count V in favor of appellant Odie Nichols and against defendants Jones, Shearburn, Carman, Wood River Bigtop Restaurant, Inc., Bethalto Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count VI in favor of appellant Alma Hillier and against defendants Jones, Carman, Shearburn, Wood River Bigtop Restaurant, Inc., Bethalto Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count VII in favor of appellant Charles Schoeneweis and against defendants Jones, Carman, Bethalto Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count VIII, in favor of appellant William Camp and against defendants Jones, Carman, Shearburn, Bethalto Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count IX in favor of appellant Paul Slaughter and against defendants Jones, Carman, Wood River Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; on Count X in favor of appellant Rebecca Lyford and against defendants Jones, Carman, Wood River Bigtop Restaurant, Inc., and Restaurant Associates, Inc.; and on Count XI in favor of plaintiff Marion Bruns and against defendants Jones, Carman, Wood River Bigtop Restaurant, Inc., and Restaurant Associates, Inc.

The trial court is further directed to determine the purchase price which each plaintiff is entitled to recover, together with interest and reasonable attorney fees as authorized by section 13A(2) of the Illinois Securities Act of 1953 (Ill. Rev. Stat. 1973, ch. 121½, par. 137.13A(2)).

Reversed and remanded with directions.

EBERSPACHER and CREBS, JJ., concur.