H. WILLIAM McPHERSON *et al.*, Plaintiffs-Appellees, *v.* JOHN HEWITT, Defendant-Appellant.

(No. 73-165; )

Second District (1st Division)—October 3, 1975.

Lasswell & Sodergren, of Batavia, and Fred M. Morelli, Jr., of Aurora, for appellant.

Nadelhoffer, Hennessey, Dommermuth & Brestal, of Naperville, for appellees.

Mr. JUSTICE GUILD delivered the opinion of the court:

The plaintiffs, H. William McPherson and Howard G. Read, filed an action in the circuit court of Du Page County alleging that John Hewitt violated the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1969, ch. 121½, par. 137.1 *et seq.*), and committed common-law fraud in the sale of Valley Aviation Corporation[1] securities to them. In a bench trial the circuit court ruled in favor of plaintiffs on both counts and awarded them jointly $10,000, plus attorney fees of $2,000. Hewitt's appeal presents three questions for review: (1) whether the plaintiffs are precluded from recovering under the Illinois Securities Law of 1953; (2) whether the manifest weight of the evidence will support the judgment on the fraud count; and (3) whether it was error to award the plaintiffs $2,000 in attorney fees.

The record reveals that on April 1, 1969, a meeting took place at McPherson's home between McPherson, Read and Hewitt. The purpose of the meeting was to discuss the possible investment of funds by McPherson and Read in a land-development project, Tyler Creek Land Company, in which Hewitt was involved. Tyler Creek Land Company had authorized the issuance of 30,000 shares of common stock and Hewitt explained that he had a right to receive one-third of that stock, which he intended to exercise through a second corporation, Valley Aviation Corporation. Valley Aviation Corporation was supposed to have authorized 30,000 shares of common stock. Hewitt advised McPherson and Read that if they jointly invested $10,000 in Valley Aviation Corporation that they would jointly receive one-fourth of the authorized com-

---

[1] Valley Aviation Corporation was never formed because of a conflict in names; instead, the Valley Air Service Corporation was formed, but it never owned any stock in Tyler Creek Land Company.

mon stock, or 7500 shares. Hewitt said he would invest $20,000 and receive 15,000 shares and that one Walter Newman would invest $10,000 and receive 7500 shares. Hewitt also told them that Valley Aviation Corporation was incorporated on March 16, 1969; that the sole assets of Valley Aviation Corporation would be the Tyler Creek Land Company stock; and that McPherson and Read would be the first ones to receive a return on the investment in Valley Aviation Corporation. Hewitt showed them the architect's drawings of the development as it would look when finished and then presented each man with a written instrument captioned, *"TYLER CREEK LAND COMPANY, VALLEY AVIATION, COMMON STOCK SUBSCRIPTION AGREEMENT."* That night both men agreed to invest $5,000 each in the Valley Aviation Corporation and signed the agreement. Hewitt signed the agreement as President, Valley Aviation Corporation, Tyler Creek Land Company. McPherson gave Hewitt $5,000 in cash that night and received a copy of a written agreement as his receipt. McPherson's copy had the following handwritten notation on it: "Received $5,000.00, APR 1 1969 J. Hewitt." On June 9, 1969, Read gave Hewitt a check for $5,000 and received a copy of the agreement he signed April 1, 1969, as his receipt. Read's copy had the following handwritten notation on it: "9 JUN 1969, Received $5,000.00 J. H., Check # 392." Hewitt endorsed and cashed the check.

Over the next two years McPherson and Read were kept informed of the progress of Valley Aviation Corporation and Tyler Creek Land Company through conversations with Hewitt. Neither McPherson nor Read ever received any stock in any corporation or written reports about Valley Aviation Corporation, Valley Air Service Corporation or Tyler Creek Land Company. Then Hewitt told them that a transaction had "gone sour" and that they had lost their investment. McPherson and Read demanded to see proof that the transaction had, in fact, gone sour and how it occurred. They have never received this information.

In June, 1971, Read contacted a law firm on his own behalf to determine his legal rights. The law firm contacted Hewitt to gain information about the transaction and was referred to Roy Lasswell, Hewitt's lawyer. Lasswell was sent a letter on June 23 requesting information about Valley Aviation Corporation and Tyler Creek Land Company, the use of Read's $5,000 and how money was invested by others. There has been no response to this inquiry.

On January 5, 1972, McPherson authorized the same law firm to represent him with reference to the Valley Aviation Corporation investment. Prior to that time McPherson had not contacted an attorney about this matter, although he had discussed the matter with Read.

On January 26, 1972, a letter was sent Certified Mail-Return Receipt Requested by the law firm to Hewitt informing him of the lack of co-operation by Lasswell and demanding proof that the transaction was not fraudulent within 15 days or else McPherson and Read would treat the transaction as fraudulent and instigate appropriate legal action. Hewitt's personal secretary signed for the letter. A copy of the letter was also sent to Lasswell. Neither responded.

On February 22, 1972, the law firm representing McPherson and Read received certified letters from the Secretary of State's Securities Division Office stating, as of February 17, 1972, that their records did not disclose any qualifications or registration under the Illinois Securities Law of 1953, of any type or class of security issued or issuable by Valley Aviation Corporation or Tyler Creek Land Company.

On February 28, 1972, a letter was sent, Registered Mail-Return Receipt Requested, by the law firm to Hewitt notifying him that McPherson and Read claimed that he violated section 12 of the Illinois Securities Law of 1953 and that they elected to void the contract, as provided in section 13 of the Act. Included in the letter were McPherson and Read's copies of the contract with an explanation that they were tendering back the contracts and demanding the return of their monies, plus interest. The letters threatened suit within 15 days if Hewitt did not comply with the demands. Hewitt's personal secretary signed for this letter. Hewitt did not respond.

On March 27, 1972, McPherson and Read filed suit and received judgment in the amount of $10,000, plus $2,000 attorney fees against Hewitt.

On appeal, Hewitt contends that the trial court erred in that: (1) the plaintiffs are precluded from recovering under the Securities Law because (a) the evidence shows no violation of the Illinois Securities Act; (b) the sale of stock was an exempt transaction; and (c) if there were violations, the plaintiffs failed to comply with the Act by not notifying Hewitt of their election to void the sale of the securities within 6 months after plaintiffs had knowledge that the sale was voidable; (2) the trial court awarded plaintiffs $2,000 for attorney's fees without any proof of reasonableness; and (3) the manifest weight of the evidence shows that there was no fraudulent or false representation of a material fact upon which the plaintiffs relied to support a fraud judgment.

We find Hewitt's contentions are without merit and affirm the judgment of the trial court.

Securities are defined in the Illinois Securities Act as including an "investment contract." In an article entitled *Exemptions from Registration under the Illinois Securities Law of 1953*, 1961 U. Ill. L.F. 205, Samuel H. Young, one of the principal drafters of the 1953 Act, states:

"\* \* \* it is pointed out that the definition of the term 'securities' in the 1953 law was taken from the Federal Securities Act of 1933, and therefore decisions under that Act should have considerable weight with the judiciary. These decisions include such broad interpretations of the term 'securities' as \* \* \* cases \* \* \* which hold that the phrase 'investment contract' includes the sale of an interest in any type of profit-seeking venture whereby the investor transfers his capital to the promoters, and looks to the promoters for the success of his investment." (1961 U. Ill. L.F. 205, 206.)

(See also *Meihsner v. Runyon* (1960), 23 Ill.App.2d 446, 453-54, 163 N.E.2d 236, 240.) "Sale" is defined in the Securities Act as:

" 'Sale' or 'sell' shall have the full meaning of that term as applied by or accepted in courts of law or equity, and shall include every disposition, or attempt to dispose, of a security for value \* \* \* also include a contract to sell, \* \* \* or a solicitation of an offer to buy, directly or indirectly \* \* \*." (Ill. Rev. Stat. 1969, ch. 121½, par. 137.2-5.)

In *Silverman v. Chicago Ramada Inn, Inc.* (1965), 63 Ill.App.2d 96, 101, 211 N.E.2d 596, 599, that court, in commenting on the definition of sale, stated:

"This definition of a sale is in itself liberal. Its obvious purpose is to exclude nothing that could possibly be regarded as a sale. Under this broad and unambiguous definition every step toward the completion of a sale would be a sale."

■■ This court holds the "subscription agreement" involved in this case was a sale of an interest in a profit-seeking venture whereby the investors, McPherson and Read, transferred their capital to the promoter, Hewitt, for the success of their investment. As such, it is an "investment contract" within the statutory definition of "securities" and, similarly, the transaction falls within the statutory definition of "sale." Therefore, the transaction is within the scope of the Securities Act and must be registered, unless exempt.

■■ There are two kinds of exemptions in the Illinois Securities Act: (1) exempt securities, and (2) exempt transactions. This case involves only the latter type of exemption. "The burden of demonstrating compliance with qualifications for statutory exemption is upon the party claiming its benefit." (*Mark v. McDonnell & Co.*, (7th Cir. 1971), 447 F.2d 847, 851.) Hewitt contends that the transaction was exempt from registration because of section 4(M) of the Act. That section states:

"§ 4 Exemption Transactions. The provisions of Sections 5, 6

and 7 of this Act shall not apply to any of the following transactions, except where otherwise specified in this Section 4:—

\* \* \*

M. The sale of subscriptions for, or shares of stock, or a corporation, prior to the incorporation thereof under the laws of the United States, or any state, \* \* \* if no commission \* \* \* for or on account of such sale, and if the number of subscribers shall not exceed 25".

This court finds that the "subscription agreement" was for the purchase of stock in a corporation in existence at the time of the sale. It was not the intent of McPherson and Read to purchase, nor of Hewitt to sell, stock in a corporation to be formed. The fact that the corporation was not a *de jure* corporation at the time of the sale because the Secretary of State's Securities Office would not allow the use of the Valley Aviation Corporation name should not allow Hewitt to avoid his responsibilities to the public. The Illinois Securities Act is paternalistic in character and should be liberally construed to better protect the public, not just from fraud and dishonesty, but also from incompetency, ignorance and irresponsibility of persons engaged in business of disposing of securities to the public. (*Martin v. Orvis Brothers & Co.* (1974), 25 Ill.App.3d 238, 245, 323 N.E.2d 73, 79.) To hold that this transaction qualifies as an exempt transaction under section 4(M) would defeat the purpose of the Act. We hold that the transaction does not qualify as an exempt transaction. Therefore, section 5 of the Act requires that the transaction be registered with the Secretary of State prior to sale. Since "Valley Aviation Corporation" or "Valley Air Service Corporation" was a new corporation, it was required to register either by Description or by Qualification. Both of those methods place a duty upon the controlling person to make sure that the security is registered. The Securities Act defines controlling person as:

"\* \* \* any person selling a security, \* \* \* owning beneficially \* \* \* either (i) 25% or more of the outstanding voting securities of the issuer of such security where no other person owns or controls a greater percentage of such securities, or \* \* \* [i]n case of an incorporated issuer, the words 'controlling person' shall mean any person selling a security, \* \* \* who directly or indirectly controls the activities of the issuer." (Ill. Rev. Stat. 1969, ch. 121½, par. 137.2-4.)

We hold that Hewitt was a controlling person in that he owned 25% or more of the shares and no other person controlled a greater percentage than he of the issuer, Valley Aviation Corporation. As such, he was required to file with the Secretary of State a report containing the data

listed in the statute. No report was filed, thus, Hewitt violated sections 5 and 12 of the Act. Section 13 of the Act provides for civil remedies for violations of the Act. The pertinent parts of that section are:

"§ 13 Civil remedies. A. Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section; and upon tender to the seller * * * of the securities sold or, where the securities were not received, of any contract made in respect of such sale, the issuer, controlling person, * * * shall be jointly and severally liable to such purchaser for (1) the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold * * * and (2) the reasonable fees of such purchaser's attorney incurred in any action brought for recovery of the amounts recoverable hereunder.

B. Notice of any election provided for in subsection A of this Section shall be given by the purchaser, within 6 months after the purchaser shall have knowledge that the sale of the securities to him is voidable, to each person from whom recovery will be sought, by registered letter addressed to the person to be notified at his last known address with proper postage affixed, or by personal service."

The question for determination is whether the condition precedents for recovery in section 13 of the Act have been completed. Hewitt contends that McPherson and Read failed to make their election of remedies within the 6 months after they had knowledge that the sale was voidable. Hewitt argues that since Read contacted an attorney in June of 1971, that he knew that the sale of the Valley Aviation Corporation securities to him were voidable and that the 6-month period began to run at that time. Furthermore, Hewitt argues that Read told McPherson what he had learned from his attorney and that the 6-month time period should run from that date for McPherson also. Hewitt concludes that both Read and McPherson are barred from recovering under the Act because they failed to make their election within the statutory time period.

■■ We do not agree with Hewitt's analysis. In *Martin v. Orvis Brothers & Co.*, that court quotes *Curtis v. Johnson* (1968), 92 Ill.App.2d 141, 155, 234 N.E.2d 566, 574, with reference to section 13(B) of the Act as follows:

"'Knowledge that the sale is "voidable" is a mixed question of fact and law on which a layman is entitled to acquire his first knowledge from an attorney.'" (25 Ill.App.3d 238, 245.)

In this case the only facts that Read and McPherson knew were that the transaction went sour and that they had lost their investment. They did not know if Hewitt had violated the Securities Act until after their attorney received the certified letters from the Secretary of State's Securities Division Office. Thus, the 6-month time period did not start until February 22, 1972. McPherson and Read filed their suit on March 27, 1972, and, therefore, are not barred from recovering the purchase price, interest and reasonable attorney fees as provided by section 13 of the Act.

■■ We now consider the propriety of the $2,000 award of attorney fees to McPherson and Read. Hewitt argues that the trial court's award of attorney fees was not based upon proof of the time expended by the plaintiffs' attorney or the reasonable value of the service in the community. On appeal, Hewitt relies upon *Spiegel v. Frangoulis* (1933), 271 Ill.App. 526, 531, for support. *Spiegel* dealt with the issue of whether a contingency fee agreement would bar the plaintiff from recovery of attorney fees under this Act. This is not what Hewitt is arguing. Furthermore, *Gowdy v. Richter* (1974), 20 Ill.App.3d 514, 530, 314 N.E.2d 549, 561, specifically rejects the reasoning of *Spiegel*.

An examination of the record reveals testimony by Mr. Hennessy that he was the attorney for the plaintiffs in this matter and that he had spent more than 100 hours in making telephone calls; attending motions; and going to trial. He stated, because of his inexperience in this area of the law, he would suggest a $20-per-hour fee as a fair and reasonable fee. Furthermore, the following colloquy took place between Mr. Lasswell and Mr. Hennessy:

> "MR. LASSWELL: Isn't it a fact that reasonable value of attorney's fees in this county are more than $20 an hour for an attorney of your standing?
>
> MR. HENNESSY: That's correct. And I would be willing to agree to a higher rate.
>
> MR. LASSWELL: No further questions."

Therefore, this court feels that there was sufficient evidence introduced in this case to provide the trial court with a reasonable basis for granting the plaintiffs $2,000 in attorney fees.

■ We next consider the defendant's contention that the manifest weight of the evidence shows that there was no fraudulent or false representation of a material fact on which plaintiffs relied to support a fraud judgment.

A misstatement of a material fact is an essential element of an action based on common-law fraud. (*Zickur v. Irmiger* (1973), 15 Ill.App.3d 805, 807, 304 N.E.2d 635, 637.) In *Norville v. Alton Bigtop Restaurant*,

*Inc.* (1974), 22 Ill.App.3d 273, 283, 317 N.E.2d 384, 391, that court, quoting the Restatement of Torts definition of materiality, stated:

> " 'A fact is material if (a) its existence or non-existence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question * * *.' (Restatement of Torts, par. 538 (1934).)"

The misrepresentations alleged to have been made by Hewitt are: (1) that Valley Aviation Corporation was incorporated March 16, 1969; (2) that Valley Aviation Corporation's sole asset was to be one-third of the authorized common stock of Tyler Creek Land Company; (3) that Hewitt would invest $20,000 in Valley Aviation Corporation; (4) that a Walter Newman would invest $10,000 in Valley Aviation Corporation; (5) that the $10,000 the plaintiffs gave Hewitt would be invested in Valley Aviation Corporation; and (6) that plaintiffs would jointly receive 7500 shares of Valley Aviation Corporation stock. The evidence showed that there never was a Valley Aviation Corporation. There was a Valley Air Service Corporation and Hewitt says that the change of the name is not a material misrepresentation. However, there is no proof that Valley Air Service Corporation ever received plaintiffs' monies, that Hewitt or Newman ever invested any money in Valley Air Service Corporation, or that Valley Air Service ever invested in Tyler Creek Land Company. Furthermore, no stock was ever issued by Valley Aviation Corporation or Valley Air Service to plaintiffs.

This court holds that Hewitt made the complained of statements and that they were, when taken as a whole, misrepresentations of material facts. There being no other issue raised with reference to the common-law fraud, we hold that the judgment of the trial court was proper.

In summation, we hold that the trial court was correct in its determination that Hewitt had committed common-law fraud and violated the Illinois Securities Law of 1953 in the sale of the Valley Aviation Corporation securities to McPherson and Read. The award of $10,000, plus $2,000 attorney fees, was proper.

Affirmed.

SEIDENFELD, P. J., and HALLETT, J., concur.