FREDERICK H. BUEHL *et al.*, Plaintiffs-Appellants, *v.* LOUIE O. DAYSON *et al.*, Defendants-Appellees (Linda Dayson *et al.*, Defendants).

Fifth District   No. 5—83—0438

Opinion filed September 27, 1984.

Paul A. Croegaert and John A. Clark, both of Croegaert, Clark & McLaughlin, Ltd., of Olney, for appellants.

Brent D. Holmes, of Harlan Heller, Ltd., of Mattoon, for appellee M. L. Rich.

Guy E. McGaughey, Jr., of McGaughey & McGaughey, of Lawrenceville (Roscoe D. Cunningham and Charles R. Vaughn, of counsel), for appellee Louie O. Dayson.

PRESIDING JUSTICE WELCH delivered the opinion of the court:

Section 13(A) of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1983, ch. 121½, par. 137.13(A)) allows a purchaser of securities to rescind any sale made in violation of that law. Notice of the election to rescind must be given to each person from whom recovery will be sought "within 6 months after the purchaser shall have knowledge that the sale of securities to him is voidable." (Ill. Rev. Stat. 1983, ch. 121½, par. 137.13(B).) This action was commenced in the circuit court of Crawford County to rescind the purchase of certain oil and gas interests which had not been registered with the Illinois Secretary of State. The court held that defendants Louie O. Dayson and M. L. Rich received notice of the plaintiffs' election to rescind more than six months after the plaintiffs had learned that the sales were voidable. This finding was supported by the evidence introduced at trial, and therefore we affirm the judgment in favor of defendants Dayson and Rich.

In the summer of 1979, Rich, who is an oil producer, approached Dayson, a physician in Vincennes, Indiana. Dayson had operated on Rich and Rich said that he wanted to show his gratitude by letting him in on some oil and gas leases he had acquired in Crawford County. Rich desired to develop the leases, but he needed investment capital. He suggested that he would be responsible for drilling wells on the leases if Dayson would find investors and sell them working interests in the wells and leases. Dayson and Rich entered into a written agreement to that effect in August, 1979.

Throughout the summer, Dayson spoke to several of his friends, neighbors and professional colleagues about the project. Among the investors were plaintiffs Dr. Frederick Buehl, his wife Bettie, Dr. Alan Stewart, his wife Pamela, Curtis Small, and Dayson's neighbors Roger Davis and Michael Kopp. Defendants Dr. James Rohrer and attorney Robert Lewis also invested. Seven wells were drilled and oil was obtained from most of them. But by late 1979, production began to drop off and eventually ceased. Drilling expenses were not paid and liens were filed against the wells.

In mid-December, plaintiff Frederick Buehl learned from Rich's secretary, Esther Odle, that the drilling venture was in debt. Buehl went to Rich's office in Robinson, Illinois, soon after that. Rich told him that Dayson had not contributed any money toward the drilling, and those missing contributions caused the shortage of money. Rich and Mrs. Odle testified that Kopp and Small were also present then. Buehl returned to Vincennes and contacted a local attorney, Arthur Hart of the firm of Hart, Bell, Deem, Ewing and Stuckey the following day. Hart said that he would investigate the matter for Buehl.

On January 3, 1980, Hart accompanied Buehl to Rich's office. In an affidavit, Rich recalled that this visit took place on December 18, 1979, although at trial he was of the opinion that it occurred on January 3. Rich testified that Hart asked him whether he had made securities filings with the appropriate State or Federal agencies. According to his testimony, Rich replied that a securities attorney had told him that he did not have to do so. Rich's attorney, James Hill of Robinson, testified that he had given Rich the name of a Chicago attorney who specialized in securities law. Both Rich and Mrs. Odle indicated that Rich had spoken with this attorney by telephone in December 1979. Rich admitted to Hart that he had filed nothing pertaining to the sales of working interests, but he noted at trial that he did not admit violating Illinois securities law by so doing. Rich stated that in response, Hart informed him that the investors were entitled to refunds of their investments.

Buehl and Hart presented a different version of the January 3 meeting. They both described the primary purpose of the meeting, as memorialized in a contemporaneous affidavit by Rich, as securing production of oil from the wells. No reference to securities or rescission was made in that affidavit, and Buehl and Hart testified that neither subject was mentioned during the meeting. Hart recalled that he had done no research into securities laws as of January 3, 1980.

Rich, Buehl and Hart did agree that Mrs. Odle and attorney Hill arrived at Rich's office some time after Buehl and Hart did. Like

Rich, Hill and Mrs. Odle executed affidavits in which they claimed that the meetings took place the previous month, but at trial they acknowledged that it occurred on January 3. Hill took no notes of the proceedings, and, although Mrs. Odle did, she later lost her stenographer's pad. Both Hill and Mrs. Odle remembered that they heard Hart announce that Rich had not complied with pertinent securities laws and that the investors could get their money back.

Dayson met with Buehl and Stewart in Buehl's Vincennes office on January 4 or 5, 1980. Buehl testified that the parties discussed obtaining the services of another oil producer. Dayson stated that Buehl recounted his visit to Rich's office with attorney Hart. As Dayson remembered, Buehl informed him that "under Federal or State statutes or regulations," he and Rich would be responsible for the debts incurred and the remaining investors "can get our money back."

On January 9, 1980, a meeting was held at Dayson's Vincennes home. Some of the parties differed in their recollections of the identity of the participants at the meeting, but it appears that investors Buehl, Davis, Kopp, Lewis, Rohrer and Small were there, along with Dayson, his brother Bob, and an oil producer named Elijah Jr. Wolfe. Dayson conceded to the group that he had not invested his share of money in the drilling operations, which, as a result, had stopped. As indicated in the testimony of the participants and in notes transcribed the following day by Buehl, much of the discussion at the meeting centered around paying outstanding bills and resuming the operation of the wells. The meeting began with a more formal session, then moved to a bar in the same room of Dayson's house.

Plaintiffs Small, Davis and Buehl testified that securities and rescission were not discussed at the meeting. Attorney Lewis recalled that there was some mention of violation of securities laws, but that discussion was "minor in nature." Lewis said that he made a comment to plaintiffs Kopp and Davis that Federal or Illinois securities laws had been violated. Elijah Jr. Wolfe did not remember any conversation about securities among the members of the group at their main meeting. However, he did indicate that Buehl informed him that he and Hart had been to Rich's office, where Rich admitted that he had not registered the securities.

Attorney Hart had a brief conversation with Dayson's counsel, Roscoe Cunningham, in Hart's office in Vincennes on January 14, 1980. Cunningham had come to the office to speak with attorney Mark Ewing about an unrelated matter and had met Hart in the halls of the office. Hart and Cunningham spoke about the developing dispute over the oil wells. Hart described the meeting as "very superfi-

cial," as he had not yet done much investigation into the case. He testified that they did not refer to securities laws. Cunningham said that Hart notified him that Rich and Dayson had not complied with Illinois and Federal securities acts and that Buehl and the other investors were going to receive their money back.

Much of the chronology of events in this case was recorded in the billing records of Hart, Bell, Deem, Ewing and Stuckey. Those records consist of a 13-page itemized statement admitted in two parts as plaintiffs' exhibits Nos. 77 and 84. Relying on those exhibits, attorney Donald Bell testified that he first became involved with the case on January 23, 1980. Attorney Hart, who was leaving for Florida, instructed Bell to review the file and handle the case for him during his absence. Bell "looked the file over, which consisted mainly of lists of investments and interests in various wells, and tried to figure out just who owned what."

The following day, Bell met with Buehl, where they "discussed the ramifications of the matter," as the firm's billing records reflect. Bell remembered that they considered several approaches to resuming production from the wells. Bell testified that he had no knowledge of the effects of Illinois securities laws at that time. He also stated that plaintiffs' exhibits Nos. 77 and 84, as far as he knew, included a complete list of all services provided by the firm.

At some time during a weekend break in the trial, another version of the firm's billing records, marked as plaintiffs' exhibit No. 96, was found in the personal files of plaintiff Alan Stewart. That version was a billing statement sent on April 17, 1981, to plaintiffs Stewart and his wife, Buehl and his wife, Davis, Kopp and Small. As conceded by Hart and Bell, the only difference between plaintiffs' exhibit No. 96 and plaintiffs' exhibits Nos. 77 and 84 is the omission of the following entries from the latter.

> "January 23, 1980    Reviewed provisions of federal securities act and also the Illinois and Indiana Security Act.
>
> January 23, 1980    Research of security law with main emphasis on Indiana and consultation between Bell and Hart in reference to Dr. Buehl's problem."

The entries immediately before and after these two entries in plaintiffs' exhibit No. 96 are numbered "18" and "20" in plaintiffs' exhibit 84, and there is no entry No. 19 in that document.

After plaintiffs' exhibit No. 96 was produced, attorney Bell was once again called to testify by the plaintiffs. Bell conceded that, con-

trary to his earlier testimony, he had indeed discussed securities law with Buehl on January 24, 1980. In his testimony, Buehl had said that he first became aware that the securities were supposed to have been registered in a conversation of May 16, 1980, with attorney Mark Ewing.

Billings at Hart, Bell, Deem, Ewing and Stuckey are made electronically. At the end of each workday, the firm's attorneys dictate their billings which are then transcribed by secretaries and stored on magnetic tape. Attorney Ewing explained that this was the firm's exclusive method for keeping track of billable entries, and no file memoranda were used for that purpose. Attorney Bell agreed that the attorneys in his firm kept no written time charges. When asked why plaintiffs' exhibit No. 96 contained the two additional entries for January 23, he replied that there "must have been something in the file" on April 17, 1981, "to indicate that there was additional work done" and that "a note of that kind would have been thrown away." Bell denied deleting or directing the deletion of any entries from plaintiffs' exhibits Nos. 77 and 84.

Another meeting of investors occurred on February 6, 1980, this time in the office of Vincennes attorney Robert Lewis. Memories differed as to the attendance at this meeting, but it appears that plaintiffs Buehl, Small and Kopp were there with defendants Rohrer and Lewis, oil producer Wolfe, attorney Cunningham and accountant Clyde Barnhart. Plaintiffs Small, Kopp and Buehl noted that there was no mention of securities or rescission at the meeting. Elijah Jr. Wolfe agreed with them, but observed that he left the meeting early. Defendant Lewis said that in discussions in a hallway after the main meeting, he told Buehl, Rohrer, Small and Kopp that there was a possibility that securities laws had been violated. Lewis's notes of the meeting itself include no mention of that subject. Defendant Rohrer testified that Lewis had spoken of securities laws both during the meeting and in the hallway conversation.

On February 9, 1980, attorney Bell sent a letter to Dayson on behalf of the plaintiffs. Bell conferred with Small, Kopp, Davis and Buehl before sending it. The letter suggested that Dayson be relieved of and be compensated for his interest in the leases, as the letter put it, "[w]ithout going into the various legal problems and ramifications involved when one sells securities in Illinois properties to non-residents of the State of Indiana [*sic*] in excess of $300,000.00 ***." In his testimony given before the production of plaintiffs' exhibit No. 96, Bell denied any recollection of having any knowledge about the ramifications of Illinois securities laws when he sent the letter.

Bell met with Buehl, Stewart, Kopp, Davis, Small and Lewis in his office on February 20, 1980. None of the witnesses to this conference testified that the issues of securities laws or rescission were considered there. In fact, plaintiff Small, defendant Lewis and attorney Bell specifically remembered that neither subject was raised.

Attorney Mark Ewing took over this case for his firm in April 1980. In the next several months, he conducted research on Illinois, Indiana and Federal securities laws, participated in conferences with the parties, and contacted the Illinois Secretary of State's office. He wrote the securities department of that office on June 6, 1980, to ascertain whether Rich, Dayson or defendant D & R Oil Productions, Inc., had registered the sale of securities to the plaintiffs or had filed for an exemption. He received a letter dated July 14, 1980, informing him that no such registration or exemption was on file. Attorney Bell sent Dayson and Rich letters dated August 6, 1980, requesting rescission of the sales on behalf of the plaintiffs. Dayson received his letter on August 13 and Rich received his on August 18.

In an affidavit filed in opposition to a motion for summary judgment, Buehl, Davis, Kopp and Small attested that they first learned in May 1980 that the sales of working interests might violate Illinois securities laws. At trial, they testified that they gained this knowledge in either May or June from various members of Hart, Bell, Deem, Ewing and Stuckey, and they were not certain that the transactions violated those laws until they received the July 1980 letter from the Secretary of State. Robert Lewis indicated that he had a telephone conversation with plaintiff Davis on September 9, 1980. In his notes of that conversation, he recorded that Davis told him that Bell first learned in March 1980 that Rich and Davis did not register the securities in Illinois. Davis denied having that conversation with Lewis.

In deciding that the plaintiffs' notices of rescission were untimely, the trial court found that the plaintiffs had knowledge of the voidability of the transactions no later than February 9, 1980. That was the date of attorney Bell's first letter to Dayson. The plaintiffs contend that events on or before that date do not prove that they had knowledge of the voidability of the sales. Instead, they argue that they could not have discovered the nature of the transactions until they received the letter from the Secretary of State.

Knowledge that a sale of securities is voidable is a mixed question of law and fact on which a layman is entitled to acquire his first knowledge from an attorney (*Curtis v. Johnson* (1968), 92 Ill. App. 2d 141, 234 N.E.2d 566; *Norville v. Alton Bigtop Restaurant, Inc.*

(1974), 22 Ill. App. 3d 273, 317 N.E.2d 384), although that knowledge may be obtained from other sources as well (*Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73). A purchaser will not be held to know the voidable nature of his transaction merely because he consulted with an attorney if that consultation involved an unrelated matter (*Gowdy v. Richter* (1974), 20 Ill. App. 3d 514, 314 N.E.2d 549) or if the purchaser learns only that the transaction went sour and that he has lost his investment (*McPherson v. Hewitt* (1975), 32 Ill. App. 3d 435, 335 N.E.2d 606). In these cases, the purchaser may point to other sources, such as a letter from the Secretary of State, to establish the date of his first knowledge of voidability. *McPherson v. Hewitt* (1975), 32 Ill. App. 3d 435, 335 N.E.2d 606.

■ In *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73, the court explained that knowledge that the stock is not registered is not necessarily synonymous with knowledge that the sale is voidable. But the statute does not require actual knowledge that the sale is voidable, either. According to the *Martin* court, the six-month notification period may run from the date that the purchaser acquires constructive knowledge of voidability, and actual knowledge of nonregistration is a factor in ascertaining the date of that constructive knowledge. Determining that date is a question of fact for the trial court, and we will defer to its findings unless against the manifest weight of the evidence. *Froehlich v. Matz* (1981), 93 Ill. App. 3d 398, 405, 417 N.E.2d 183, 189.

■ We need not review the facts of this case again to demonstrate that the testimony of both sides was replete with inconsistencies and issues of credibility. From the defendants' witnesses, the court could have found that the plaintiffs knew before February 9, 1980, that the sales were neither registered nor exempt and that they had learned the legal effect of that omission from their attorneys. Its determination that the plaintiffs had constructive knowledge as of that date that the sales were voidable must therefore be upheld.

*Frendreis v. Financial Concepts, Ltd.* (1982), 106 Ill. App. 3d 438, 435 N.E.2d 1304, relied upon by the plaintiffs, is distinguishable. There, the court held that "when the seller or issuer of challenged securities is defending the legality of the transaction, the buyer does not acquire knowledge of voidability (for purposes of the six-month rule) until the illegality of the transaction has been established in a judicial or quasi-judicial proceeding." (106 Ill. App. 3d 438, 443, 435 N.E.2d 1304, 1307.) In *Frendreis,* the securities contained a clause that they were being sold pursuant to exemptions to Illinois and Federal securities law. After investigating inquiries from the plaintiffs,

the Secretary of State initiated administrative proceedings against the defendants to determine whether the sales violated Illinois securities laws. A hearing officer concluded that they did.

The court found that the plaintiffs obtained knowledge of voidability upon receipt of the hearing officer's decision, not, as the trial court held, upon receipt of notice that the legality of the sales was being challenged. Here, no administrative proceedings were pending, and the plaintiffs, unlike those in *Frendreis*, contacted an attorney long before they received any communications from the Secretary of State. The six-month-notice rule is an equitable feature built into the statute to protect against stale claims. Its purpose is to prevent purchasers who have sufficient knowledge of the remedy available to them from waiting the entire three-year statute of limitations to decide whether to elect rescission. (*Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73.) That purpose would be frustrated if we would read the statute to allow all purchasers of unregistered securities, including those who learned from an attorney that such a purchase is voidable, to wait for a notice from the Secretary of State to begin the six-month period. If this were so, purchasers could wait until far into the statutory limitations period to contact the Secretary of State and commence the running of the notice period. The *Frendreis* rule should not be extended beyond the situation in which administrative proceedings to determine the legality of the transactions are pending and the purchasers did not otherwise learn of the voidability of the transactions before those proceedings began. That situation does not exist here.

For these reasons, we agree with the trial court that the plaintiffs' notices of rescission were untimely. Having decided that, we need not consider the remaining contentions of defendants Rich and Dayson, most of which are concerned with the applicability of the Securities Law of 1953 to these transactions. The judgment of the circuit court of Crawford County is affirmed.

Affirmed.

JONES and KASSERMAN, JJ., concur.