GEORGE R. FROEHLICH, Plaintiff-Appellant and Defendant-Cross-Appellant, v. CONRAD F. MATZ, JR., Defendant-Appellee.—(WILBUR MARTIN et al., Intervening Plaintiffs-Appellants and Cross-Appellees.)—FRANK VEZAIN, Plaintiff-Appellant and Cross-Appellee, v. GEORGE R. FROEHLICH, Defendant-Cross-Appellant.—(CAROLYN BORYS BUCHANAN et al., Defendants-Appellees.)

Third District    Nos. 79-158, 79-155 cons.

Opinion filed February 10, 1981.—Rehearing denied March 25, 1981.

Craig M. Armstrong, of Armstrong Law Offices, of Ottawa, for appellant George R. Froehlich.

Edward F. Kelly, of Drendel & Kelly, of Streator, for appellants Wilbur Martin, Lucille Martin, Robert Washko, Irene Washko, Richard Hornick, and David Hornick.

Frederick W. Irion and George C. Hupp, Jr., both of Hupp, Irion & Reagan, of Ottawa, for appellant Frank Vezain.

McClintock & Steele Law Office, of La Salle, for appellee Carolyn Buchanan.

Larry Hofreiter, of Ottawa, for appellee Conrad F. Matz, Jr.

Mr. JUSTICE ALLOY delivered the opinion of the court:

These consolidated actions, involving charged violations of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1977, ch. 121½, par. 137.1 *et seq*.), arise out of the formation and sale of securities of the SlaBurCo Development Corporation, an Illinois corporation. Due to the complexity of the case and issues raised on this appeal, it will be useful to set forth the factual background of relevant events, after which the various issues raised on appeal by the parties will be noted and addressed.

Sometime in 1971 or 1972, Dr. Paul Burman, an Ottawa, Illinois, chiropractor, became acquainted with Dr. Conrad Matz, Jr., a Pennsylvania chiropractor. They met at a professional seminar in Pittsburgh, and during conversation Dr. Matz informed Dr. Burman of a profitable business venture in which he owned a substantial interest. The venture discussed was that of growing vegetables hydroponically, which is done in greenhouses and provides year-round production of vegetables. Dr. Matz had such greenhouses established in Florida and Nassau. Dr. Matz discussed the hydroponic system of vegetable growing with Dr. Burman, explaining to him the processes and costs involved in such operations. Later, when Dr. Burman returned to Ottawa, he and two other men decided to form and promote a corporation for the purpose of raising tomatoes and other vegetables year-round, by the hydroponic method. The other men who initially joined Burman in the enterprise were Richard Clemmons and Donald Slater.

Articles of incorporation for the SlaBurCo Development Corporation were filed with the Secretary of State's Office of the State of Illinois on March 14, 1973. The articles filed with the Secretary of State authorized the issuance of 100,000 shares of common stock with no par value, of which 32,000 shares were to be issued at $1 per share, to the promoters, while 68,000 shares were to be issued to outsiders at $10 per share. Shares certificates, dated April 6, 1973, were issued to the following named persons: Dr. Paul Burman (16,000 shares), Richard Clemmons (12,160 shares), Dr. Conrad Matz (2,240 shares), Carolyn Borys Buchanan (125 shares). Donald Slater, an original promoter, for unspecified reasons, had either withdrawn or had been ousted as a promoter by the time of the stock issuance.

According to the findings of the trial court, supported in the record, Dr. Matz' shares were issued to him without his knowledge, at the direction of Dr. Burman. Matz never received the share certificate nor did he receive any notice of the issuance of the shares until after the sales, which form the dispute in these cases, had been made. The certificate relating to Dr. Matz' shares was kept by Dr. Burman at his office in Ottawa, which was also the corporate office for SlaBurCo Corporation. The 125 shares issued to Carolyn Borys Buchanan, Dr. Burman's receptionist-secretary,

are dated April 6, 1973. However, the record reveals that the share certificate for her stock was actually issued in March or April of 1974. At that time, the directors of the corporation determined to repay Carolyn Buchanan for secretarial services she had rendered to the corporation from March 1973 to March 1974 by issuance of 125 shares to her, backdated to April 6, 1973.

The record also reveals that despite the $1 per share value set for the shares in the articles of incorporation, no consideration was received by the corporation for the issuance of any of the first 30,525 shares, which were to have been purchased at $1 per share. The only money to come into the corporation at the outset of its existence was that contributed by George Froehlich, a plaintiff-appellant and defendant-cross-appellant in these actions. Froehlich had been solicited by Dr. Burman to invest in the corporation on or about March 26, 1973. At that time, which was shortly after the filing of the articles of incorporation, Froehlich was informed of the original stock plan, with the 32,000 shares to be issued for $1.00 per share and the remaining 68,000 shares at $10.00 per share. Dr. Burman persuaded Mr. Froehlich to invest in the corporation, and Froehlich paid $27,000 to the corporation for 2,750 shares of stock. Froehlich's secretary, Faye Durbin, who had been the contact between him and Burman, was given 500 shares, in consideration of Froehlich's investment. These shares were later assigned to Froehlich. On March 17, 1973, George Froehlich signed a statement agreeing to serve as a director of SlaBurCo Development Corporation.

All of the shares issued by the corporation were signed by Carolyn Borys Buchanan, at the direction of Dr. Burman, for whom she acted as secretary. She, as well as Burman, also applied the seal of the corporation to documents requiring it.

Between March 27, 1973, and August 20, 1973, a number of meetings were held in which corporate business was discussed. Participating in those meetings, which were held either at Dr. Burman's office or at the corporation's principal place of business in Mendota, Illinois, were Dr. Burman, Mr. Clemmons and George Froehlich. While Carolyn Buchanan was present during parts of the meetings held at the office, she did not participate in them and her main duties were confined to getting coffee and running errands. At the meetings held during this time, the general operation of the business was discussed, including matters of hiring and firing at the greenhouse. Also discussed was the financial condition of the corporation. As early as the meetings in July 1973, George Froehlich became concerned about the financial condition of the company. He asked to see a financial statement on the company and he wanted to know what had been done with the moneys that had supposedly been taken in by the corporation as consideration for the issuance of the original shares.

At a meeting around the middle of July 1973, Froehlich was first informed that he was the only shareholder who had actually paid money to the corporation for the purchase of stock. Until that time, Froehlich had believed that the original shareholders had contributed $1 per share for their shares. Upon learning that the others had not contributed their $1 per share as had been represented to him by Dr. Burman, Froehlich became upset. In his testimony at trial he stated that he told them he wanted the money to be contributed. He also stated that he supported further sales of shares in the corporation in order to bring in more capital. At that time, according to his testimony, he still considered the project to be a good one. At one of these meetings it was agreed that new investors should be sought and also that some of the shares held by Froehlich would be repurchased from him by the corporation from the new investment money. Froehlich had purchased an additional $20,000 worth of stock in the latter part of July, when the corporation was in need of additional funds. On August 21, 1973, George Froehlich owned 10,975 shares of stock in SlaBurCo Development Corporation and wanted to get some of his investment returned.

It was also on August 21, 1973, that Frank Vezain, the plaintiff in a subsequent action against Froehlich and the others, purchased his stock. Vezain purchased 1,000 shares of stock for a total consideration of $10,000. Vezain was a patient of Dr. Burman, and had been solicited by Burman to purchase the stock. Vezain received a share certificate covering his 1,000 shares which was signed by Dr. Burman, as president, and by Carolyn Buchanan.

On September 4, 1973, a board of directors meeting was held in the law offices of attorney Louis Olivero in Peru, Illinois. Dr. Burman presided over the meeting and both Carolyn Buchanan and George Froehlich were present. The minutes of that meeting, handwritten by Mrs. Buchanan, indicate that among the topics of discussion was the operation of the greenhouse and the possibility of a stock split. The minutes also indicate that there was again agreement that if any new shareholders invested in the corporation they would buy Froehlich's shares. A shareholders meeting following the board meeting was attended by Burman, Clemmons, Vezain, Froehlich and Buchanan.

In the early part of 1974, various investors purchased shares of stock in the corporation. Plaintiffs Richard and David Hornick bought 200 shares of stock. Plaintiffs Wilbur and Lucille Martin bought 150 shares, and plaintiffs Robert and Irene Washko bought 150 shares. They paid $10 per share for their stock.

In the early part of June 1974, Dr. Paul Burman, the moving force behind the corporation, was killed in an automobile accident. Dr. Conrad Matz, from whom Burman had first heard of the hydroponics operation

and who had given technical advice about the growing operation, flew in from Pennsylvania to attend the funeral. It was then that he first met George Froehlich and some of the other shareholders of SlaBurCo. On July 12, 1974, Dr. Matz again came to Ottawa to help Mrs. Burman, Dr. Burman's widow, with the operation of the corporation. On July 20, 1974, a board of directors meeting was held at the law offices of Peter Ferracuti, in Ottawa. Dr. Matz, who was listed as a director in the minutes of that meeting, chaired the meeting and was in charge. Attending the meeting were Mrs. Burman, Ed Simko (newly elected president), Dr. Matz, and Carolyn Buchanan. George Froehlich did not attend. A lease agreement on the greenhouse, authorization procedure for corporate checks, and the corporation's attorney were topics of discussion and action.

On August 20, 1974, the first annual shareholders meeting was held in Peru, Illinois, at the Holiday Inn. George Froehlich was in attendance, as were Frank Vezain, the Martins and the Washkos. Neither the Hornicks nor Dr. Matz was present. At the meeting it was announced that the corporation expected to receive an insurance payment of $100,000 the following week, which was payable as the result of "key-man" insurance covering Dr. Burman. It was also reported that corporate debts stood at $34,610 and that SlaBurCo had a net loss in 1973 of $52,000. George Froehlich moved to have the corporation repurchase half of his 11,000 shares for $27,500, but his motion was defeated. At the meeting, Froehlich and his secretary, Faye Durbin, officially resigned from the board of directors.

The last shareholders meeting was held on December 4, 1974. No minutes of the meeting were made. At the meeting the discussion centered upon the fact that the sale of the corporation's stock was voidable by those who had purchased the stock because the stock sales had not been registered with the Secretary of State, as required by the Securities Act. (Ill. Rev. Stat. 1971, ch. 121½, pars. 137.5, 137.13.) On or about December 18, 1974, Frank Vezain and the plaintiffs Martins, Washkos and Hornicks first learned of their right to void the stock they had purchased because of the failure by the promoters to register the stock.

After requisite notice had been received and no offer to repurchase was made, the above-mentioned purchasers filed suits to recover their purchase moneys. All of the suits were based upon the sale of unregistered securities by the corporation. (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13.) Plaintiff George Froehlich also filed suit, naming as defendant Dr. Conrad Matz, whom he alleged to be a promoter and controlling person of SlaBurCo as defined by the securities law. Under section 137.13 of the securities law, which we shall set forth in detail later, promoters, controlling persons and directors may be liable, jointly and severally, to per-

sons purchasing stock where the sale has been made in violation of the Act. A separate suit was filed by plaintiffs Martins, Hornicks & Washkos, in which Dr. Matz and George Froehlich were named as defendants. That suit charged that both Matz and Froehlich were promoters, controlling persons and directors of SlaBurCo at the time the plaintiffs purchased their stock. It sought to have both men held liable to the full amount expended by plaintiffs in the purchase of their stock. The third suit was instituted by plaintiff Frank Vezain to recover the $10,000 he spent to purchase 1,000 shares of stock. Defendants named in the Vezain suit were Froehlich and Matz, as well as Carolyn Borys Buchanan, Mrs. Burman (as executor of her husband's estate) and Richard Clemmons. All of the suits were consolidated for trial, before the judge sitting without a jury.

The trial court found that Dr. Conrad Matz, who was named in all three individual suits, and Carolyn Buchanan, who was named in the suit by Vezain, were not liable to any of the plaintiffs. The court entered directed verdicts in favor of Matz and Buchanan. The other defendant, George Froehlich, was found to be liable under the statute to plaintiff Vezain and to plaintiffs Martins, Hornicks, and Washkos. A judgment against Froehlich, in the total amount of $15,000, was entered. That sum represented the moneys the named plaintiffs had paid into the corporation for their stock. Neither defendant Mrs. Burman, as executor of Dr. Burman's estate, nor Richard Clemmons, who had died prior to trial, was involved in the trial or the judgment which was finally entered in the consolidated actions.

From the judgments entered by the court, the appeals and cross-appeals that are the subject of this case were taken. Plaintiff Frank Vezain appeals from the court's order directing a verdict in favor of defendants Dr. Matz and Mrs. Buchanan. Vezain argues that the evidence established that Matz and Buchanan were controlling persons, as defined by statute, and that they, therefore, were strictly liable for the violations involved in the unregistered sale of securities. Vezain also argues that the evidence indicated that defendant Buchanan was an officer and director in the corporation who aided and participated in the making of the sale of stock to him. If so, liability would attach under the statute.

The plaintiffs Washkos, Hornicks and Martins appeal from the granting of a directed verdict in favor of defendant Conrad Matz. They contend that it was error to have done so, since the evidence showed that Matz was a controlling person on behalf of whom the sales of securities were made.

George Froehlich appeals from the judgments entered. Froehlich contends that the evidence established that Conrad Matz was a controlling person and that, as such, Matz was liable to him for the moneys he, Froehlich, had paid to the corporation for stock purchases. Froehlich also

argues that he was not a controlling person under the statute and that the court erred in entering judgment against him and for the plaintiffs.

Before addressing the numerous individual issues that are raised in the appeals in the instant case, it is useful to set forth the statutory sections which are implicated in those issues. Section 13 of the Illinois Securities Act is the statutory section upon which all of the plaintiffs have based their actions. In pertinent part it states:

"Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section; and upon tender to the seller or into court of the securities sold or, where the securities were not received, of any contract made in respect of such sale, the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making such sale, and in case such issuer, controlling person, underwriter or dealer is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making such sale, shall be jointly and severally liable to such purchaser for (1) the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated then at the legal rate of interest) less any income or other amounts received by such purchaser on such securities and (2) the reasonable fees of such purchaser's attorney incurred in any action brought for recovery of the amounts recoverable hereunder." (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13.)

Parts B and C of section 13 set forth the notice, tender and limitation provisions with respect to the civil remedy set forth in Part A, set out above. They are not pertinent to the appeals. With respect to the existence of violations in the sale of securities to plaintiffs, there is no dispute in the cases that the sales of securities to Froehlich, Vezain, the Martins, the Hornicks and the Washkos were all made in violation of the provisions of the Securities Act. No registration statement, or statement of exemption, with respect to the sales was ever filed with the Secretary of State, as is required by section 5 of the Act. The statute makes a "controlling person" liable for violations, and that term is defined in section 2—4 of the Act.

" 'Controlling person' means any person selling a security, or group of persons acting in concert in the sale of a security, owning beneficially (and in the absence of knowledge, or reasonable grounds for belief, to the contrary, record ownership shall for the purposes hereof be presumed to be beneficial ownership) either (i) 25% or

more of the outstanding voting securities of the issuer or such security where no other person owns or controls a greater percentage of such securities, or (ii) such number of outstanding securities of the issuer of such security as would enable such person, or group of persons, to elect a majority of the board of directors or other managing body of such issuer. * * *." (Ill. Rev. Stat. 1971, ch. 121½, par. 137.2—4.)

Also of some pertinence is the definition of sale or sell which is set forth in the Act.

" 'Sale' or 'sell' shall have the full meaning of that term as applied by or accepted in courts of law or equity, and shall include every disposition, or attempt to dispose, of a security for value. 'Sale' or 'sell' shall also include a contract to sell, an exchange, an attempt or an offer to sell, an option of sale or a solicitation of an offer to buy, directly or indirectly; * * *." (Ill. Rev. Stat. 1971, ch. 121½, par. 137.2—5.)

Having set forth the applicable statutory provisions, we turn now to the issues raised by the parties concerning them.

■■ All of the plaintiffs assert as error the court's action in directing a verdict in favor of defendant Dr. Conrad Matz. The argument is vigorously made that the evidence established that Matz was a promoter, controlling person and director of SlaBurCo Development Corporation and that, as such, he ought to have been held liable for the violations which occurred in the selling of securities. The trial court, however, in its findings of fact (both oral and written), found that Dr. Matz was not a promoter of the corporation or a controlling person or director at the time of the securities sales to plaintiffs. With regard to appellate review over findings of fact by a trial court sitting without a jury, it is well established that those findings will not be disturbed unless clearly or manifestly erroneous. (*Grundy County National Bank v. Myre* (1978), 65 Ill. App. 3d 368, 372, 381 N.E.2d 1204.) In seeking to connect Dr. Matz with the corporation and with the sales of securities, requirements for liability under the statute, the plaintiffs emphasize that Dr. Matz was issued 2,240 shares of stock, at Dr. Burman's direction, which stock is dated April 6, 1973. They note that Dr. Burman referred to Dr. Matz as a stockholder on papers shown to others in March and April of 1973. They assert, though the evidence is contradictory, that Dr. Matz knew of the issuance of the stock in his name and acquiesced in the issuance. They also point out that Matz gave technical advice and assistance to the corporation and to Dr. Burman concerning the operation of the business and the greenhouses. From the evidence indicating the issuance of stock to Dr. Matz and his assistance to Dr. Burman and the corporation, the plaintiffs conclude that he was a controlling person such as to become liable for the violations in

the sale of securities by the corporation. They also argue that he was a director and that he is liable as a director.

The problems with plaintiffs' positions concerning Dr. Matz are factual ones. There was no evidence to indicate that Matz ever received his shares or even any formal notice of their issuance to him. The certificate bearing Matz' name was issued at the direction of Dr. Burman, and it was kept, also at Dr. Burman's direction, in Burman's office in Ottawa. The court found that Dr. Matz was unaware of the issuance to him of the stock. While Mrs. Buchanan's testimony was that Burman informed Matz about the stock, this hearsay evidence was directly contradicted by Dr. Matz' testimony, believed by the trial court, that he did not know he was a shareholder until August of 1974, well after all the sales at issue herein had been completed. While record ownership is presumed to be beneficial ownership, absent evidence to the contrary (Ill. Rev. Stat. 1971, ch. 121½, par. 137.2—4), in this case the other evidence indicated that Dr. Matz was unaware of the stock issued to him and did not request or accept it at the time of its issuance. The evidence in the record supports the trial court's finding that Matz was unaware of his stock ownership until after the sales of securities to others.

Apart from the question of his ownership of stock in the corporation, however, the critical failure of the plaintiffs' cases against Dr. Matz was that they could present no evidence that he participated in, or had any knowledge of, the decision to sell the securities to others or in the actual sale of the securities. To be held accountable for violations of the securities law as a member of a controlling group it is necessary for the group to have acted in concert in the sale of the securities. (Ill. Rev. Stat. 1971, ch. 121½, par. 137.2—4.) As already noted, there was no showing in this case that Dr. Matz ever acted in concert with the others in the sale of the securities. He took no part in the decision to sell securities nor in the sales. While overt action by a member of a controlling group would not always be required, there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group in selling securities, before an individual will be held liable for the actions of the controlling group. A person is not liable merely because one can add his share holdings onto the holdings of a controlling group and they still remain a controlling group. Some connection with the sale, or decision to sell, securities is required under the statute, and no such connection was shown to have existed with respect to Dr. Matz in this case. The trial court's conclusion that Matz was not a controlling person is supported in the record.

As to the asserted liability of Dr. Matz, as a director of the corporation, the trial court found that he was never a *de jure* director of SlaBurCo. He was never elected a director, and he denied any knowledge

of his being named as such. The only time he ever attended a meeting of the corporation was in July 1974, when he did attend and preside over a board of directors' meeting following the death of Dr. Burman. Prior to that time, he had not attended a single meeting of the corporation. He testified that he took charge in July 1974 at the request of Dr. Burman's widow and in order to help the corporation. Even conceding, *arguendo*, that in so doing he was a "person performing a similar function" to that of director, in the words of section 13, the July 1974 meeting in which he did so was *after* the sales of unregistered securities had been made to the plaintiffs. The statute requires that for a director or officer to be held liable for violations of the Act, he must have participated or aided in making the sales of securities. As indicated above in our discussion of the definition of "controlling person," there is no evidence in the record to indicate that Dr. Matz participated or aided in the sales of securities to plaintiffs. His actions after the sales had been made, which actions were unconnected with the sales, did not give rise to liability under the statute. Nor can we conclude, on the evidence, that Dr. Matz was a "person * * * on behalf of whom said sale was made." (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13.) As the trial court noted, Dr. Matz had no knowledge of the sales or any knowledge that he was an owner of the stock at the time of the sales to plaintiffs. To hold him liable on these facts, merely because shares issued in his name, without his knowledge or acceptance, may have benefited from the added investment provided by the sales to others, would be to unreasonably and inequitably expand the liability established under the Securities Act into areas never intended. The Act does, in a sense, impose strict liability on persons involved in a sale of securities in violation of the statute. However, it is not so strict as to create liability on Dr. Matz in this case where he had no connection with the sales at all. We find no basis to reverse the court's factual findings with respect to Dr. Matz, and we affirm the trial court's action in directing verdicts in his favor at the close of plaintiffs' cases.

We next turn to the court's action in directing a verdict in favor of the defendant Carolyn Borys Buchanan. Carolyn Buchanan was a defendant in the suit filed by Frank Vezain, and not in the other suits. Vezain, in appealing the directed verdict in her favor, argues that the evidence established that she was a controlling person, as a member of a controlling group, and that she was an officer of the corporation. Either position would make her liable for the sale of unregistered securities, if she had participated or aided in their sale. The trial court, in its findings of fact, concluded that she was not liable either as a controlling person or as secretary of the corporation. The court found that she was not an officer of the SlaBurCo corporation in a *de jure* sense. She had not been elected to that position, and she testified she was not secretary of the corporation.

However, the evidence indicated that she did perform duties that a secretary-treasurer of a corporation would normally perform. She did record the minutes of the meetings held and she also signed the stock certificates issued by the corporation. The latter duty was performed at the direction of, and on the authority of, Dr. Paul Burman. In discussing her actions in signing the share certificates, the trial court found that she signed them "completely at the behest of Burman ordering, everything that was done was his thought, and that she was acting only as scrivener. As a matter of fact, when she signed them as secretary, she was not even the secretary, only a person who was appointed to sign these certificates." From the court's findings, and from the evidence in the record, it is apparent that Mrs. Buchanan's role in corporate affairs and decisions was a very limited one. She was Dr. Burman's secretary-receptionist in his chiropractic office. When he started the corporation, she was asked to help him with the books and other secretarial chores. She made calls, typed letters, and handled such ministerial details as Burman requested or directed. When Dr. Burman needed someone to sign the stock certificates as secretary-treasurer of the corporation, he directed her to sign them. The evidence in the record clearly shows that she had no independent authority in the corporation and that she did not act independently in any of the actions that she performed for the corporation. She followed Burman's directions.

■■ The Act makes officers and directors of a corporation liable, and also those performing similar functions, where such persons participated in or aided in making the sale of securities. (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13.) Plaintiff Vezain argues that through her action in signing the share certificates, Carolyn Borys Buchanan aided and participated in the sale of securities to him. In support of this position, Vezain's counsel cites *Foreman v. Holsman* (1958), 16 Ill. App. 2d 466, 148 N.E.2d 595, an abstract case which dealt with pre-1953 securities law in Illinois. The issue in that case was whether a corporate trustee, who had performed only ministerial duties in connection with an illegal sale of a beneficial interest, was liable to the purchasers as a seller. The court found liability and based its decision on three grounds: (1) that the trustee reserved to himself the power to prevent the issuance of certificates and could have used that power to prevent illegal sales; (2) that the power was the only protection available to investors; (3) that the trustee held himself out as protector of the investor. Vezain argues that officers and directors of corporations are usually in positions similar to that of the trustee in *Foreman*. Regardless of the validity of that assertion as regards the usual position of officers and directors, the evidence indicates that Mrs. Buchanan was not in such a position *vis a vis* this corporation. As already noted, she was not the secretary of the SlaBurCo Development Corporation. She was Dr.

Burman's secretary and receptionist, who did as she was directed with respect to corporate business. She had no authority or power on her own. There is no evidence to indicate that she could have prevented the issuance of certificates to others or in any way have otherwise used her position to prevent the sales of stock. Nor do we find that by her conduct in following Dr. Burman's direction she held herself out as a protector of the investors in the corporation. We do not find the *Foreman* case's reasoning applicable to Mrs. Buchanan and her position with the corporation. Liability is imposed on officers and directors who participate or aid in the sale of securities. We find that Carolyn Buchanan's act in signing the certificate of Frank Vezain, at the express direction of Dr. Burman, was not a sufficient action, given her position, to establish that she aided or participated in the sale. We agree with the trial court that this action on her part did not give rise to liability against her as an officer participating or aiding in the sale of securities to Frank Vezain.

Vezain also argues that Carolyn Buchanan was a controlling person in that she belonged to a group of persons who controlled the corporation. Even conceding that she was an owner of stock at the time Vezain made his purchase, a matter to which we return, the critical inquiry still remains whether she acted in concert with other members of the stockholding group in the sale of securities to Frank Vezain. The trial court found no evidence that she did anything in furtherance of the sale of stock to Vezain. That she kept minutes of the meetings, or brought coffee to the directors, or typed letters and placed calls does not indicate participation in the decision to sell securities to others. And we have already determined that her signing of the stock certificates, at the direction of Burman, did not sufficiently establish her participation or aid in the sale to Vezain. Nor do we conclude that her signing of the certificates, under the circumstances, established concerted action on her part together with Burman, Froehlich and Clemmons in the sale of securities. As noted previously, Carolyn Buchanan's position with the corporation was a limited one. She did as Burman directed her. She had no authority or power on her own.

The controlling members of the corporation were Burman and Clemmons, and it is they, along with Froehlich, who made the decision to sell stock to others. We do not find, as a matter of law, that Buchanan's act in signing the Vezain certificate constituted concerted action on her part with the others in the sale. Rather, the record supports the trial court's conclusion that she did not act in concert with the others in the sale of stock to Vezain. We also note, in passing, that the record reveals that Mrs. Buchanan did not receive her shares in the corporation, which shares were dated April 6, 1973, until March or April of 1974. The 125 shares she received in 1974 were for the secretarial services she had performed for

the corporation between February 1973 and February 1974. They were given to her in 1974, without consideration paid, and then backdated to April 1973. As a factual matter then, she was not an owner of shares in the corporation in August 1973, when the sale of securities to Frank Vezain was completed. For all the reasons above discussed, we find the trial court did not err in directing a verdict for Carolyn Buchanan as against plaintiff Frank Vezain.

Having determined that there was no error in the trial court's directing verdicts in favor of Dr. Matz and Mrs. Buchanan, we next turn to the judgments entered against Froehlich and in favor of Vezain, the Washkos, the Hornicks, and the Martins. Froehlich's argument on appeal, as advanced by counsel, is that he was an innocent investor, taken in by Burman, Clemmons and Matz and taken advantage of by them. The record, to a considerable degree, supports that conclusion, at least with respect to Dr. Burman and Mr. Clemmons. We have already determined that Dr. Matz was not a promoter or otherwise involved in the corporate affairs and the sales of securities. Dr. Burman, and through him Mr. Clemmons, represented to George Froehlich that they, as original promoters, were putting up $1 per share for their shares in the corporation. Froehlich was offered his shares for $10 per share, and he believed, based upon Burman's representations, that his $27,000 investment would bolster corporate assets to nearly $60,000. In fact, the money he paid in was the only money paid in to the corporation. The original promoters had issued stock to themselves, and to several others, without paying any money into the corporation as consideration. This conduct, from the record before us now, clearly perpetrated a fraud upon Mr. Froehlich and was actionable, as well, as a violation of the Illinois Business Corporation Act. (Ill. Rev. Stat. 1973, ch. 32, par. 157.17, 157.18.) In addition to any liability under those theories, there is the fact that Dr. Burman and the corporation, as well as Clemmons, would be liable to Froehlich for the value of the shares he purchased, because those shares were not registered upon sale. (Ill. Rev. Stat. 1971, ch. 121½, par. 137.5, 137.13.) From the record then, it is clear that Burman, and possibly Clemmons as well, unfairly and illegally (however unintentionally) misused George Froehlich, and that Froehlich would have actions against them for the moneys he paid in to the corporation. However, to Mr. Froehlich's great misfortune, both men (Burman and Clemmons) died prior to action being taken by him against them. Since there is no provision in the Securities Act for the survival of actions under section 13 (see *Caldwell v. Cole* (1927), 326 Ill. 502, 158 N.E.2d 159), Froehlich is without recourse under the statute except against the issuing corporation. Yet, no suit against the corporation is before us, nor do we know the assets it may possess to satisfy debts and liabilities. Thus, the matter of Froehlich's position *vis a vis* the original promoters is not

before us on this appeal. Furthermore, that Froehlich was injured by Burman and Clemmons and suffered as a result of their violations of the Securities Act does not determine the question of his own liability *vis a vis* later investors in the corporation. It is these later investors who are the plaintiffs in the actions against Froehlich before us now. While the trial court felt it unjust, nevertheless it concluded that Froehlich was liable, under the Act, to the later investors because of his action in concert with the other early investors in the decision to actively seek new investors for the corporation's stock. We find no error in the court's conclusion and judgment as to Froehlich's liability, and we are less inclined to view the imposition of liability as unjust. The facts in the record indicate that in July 1973, Froehlich learned that his was the only money in the corporation. At the same time, Froehlich and the others were concerned about the financial condition of the corporation. The corporation was in need of further money to continue, and the promoters came to Froehlich for further investment. At that point in time, and given his knowledge that he had been deceived, Froehlich could have taken action against the corporation and against Burman for the fraud upon him and for the issuance of unregistered securities. Instead of pursuing his rights as against Burman and the corporation, however, he took an active part in urging and agreeing to further stock sales to outsiders in order to bring further money into the corporation. Froehlich, who was himself concerned about the financial condition of the corporation and who had knowledge that the original promoters had misrepresented financial facts to him, nevertheless joined with them in a decision to seek further investment from others.

The evidence in the record fully supports the trial court's conclusion that Froehlich, prior to the time Vezain and the others were solicited, agreed with Dr. Burman and Clemmons that new investors should be brought into the corporation if possible. The evidence also indicates an agreement among them that a portion of any new investment moneys brought in would be used by the corporation to repurchase some of Froehlich's stockholdings. Such was the clear testimony of Carolyn Buchanan, which was supported by Froehlich's own admission that he wanted new money to come into the corporation. Further support comes from the testimony of Frank Vezain concerning Dr. Burman's statements prior to the sale to Vezain and also from the minutes of the September 4, 1973, board meeting. Additional proof of that agreement and understanding with respect to new stock purchasers is found in a letter from Froehlich to Ed Simko, president of the corporation, in August 22, 1974. Froehlich wrote: "It was agreed that I would get my last investment back as soon as other stockholders came in. Frank purchased $10,000 worth of mine and I still need the remaining $23,000 * * *." Thus, the record indicates that despite his misgivings about the financial condition of the

corporation, and despite his knowledge that the promoters and still majority stockholders had lied to him about the finances, Froehlich nevertheless participated in, and concurred with, the corporate decision to seek new investors through stock sales. Furthermore, that further stock sale was done with the purpose, in part, of repurchasing Froehlich's shares, and thereby permitting him to recoup part of his imperiled investment. We agree with the trial court that by Froehlich's concurrence in the decision to sell stock to others, Froehlich acted in concert with Burman and Clemmons in the sale of securities to Vezain and the others. It is also established in the record that as a group, Froehlich, Burman and Clemmons beneficially owned such number of outstanding shares of SlaBurCo as would enable them to elect a majority of the board of directors. Thus, Froehlich is liable, as the trial court held, under section 2—4(ii) of the Securities Act as applied in section 13. (Ill. Rev. Stat. 1971, ch. 121½, pars. 137.2-4(ii), 137.13.) That he had no specific knowledge of the individuals solicited, or that he did not solicit them, does not remove or negate his active participation and encouragement in the decision to seek other investment. "Sale" and "sell" receive broad definition in the Act, and they include general offers to sell securities and other decisions not directly tied to individual stock sales. (See Ill. Rev. Stat. 1971, ch. 121½, par. 137.2-5, set forth previously in this opinion.) There was no error in the court's conclusion that Froehlich was a "controlling person" under the statute with respect to the sale of stock to plaintiffs. That he opposed other actions by Burman and Clemmons, or that he was not a part of the real controlling group, practically speaking, does not alleviate or minimize his conduct, in acting in concert with them, in deciding to seek new investors through stock sales to others. Nor does the fact that he was injured by Burman and Clemmons (and had valid claims against them) excuse his subsequent conduct with respect to these plaintiffs.

Furthermore, while the trial court did not so find, Froehlich would also be liable as a person "by or on behalf of whom said sale was made" (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13) by virtue of the fact that the sales were made, at least in part, for the purpose of permitting the corporation to repurchase his shares.

For all of the reasons discussed above, there was no error in the court's entry of judgment against defendant George Froehlich and on behalf of the named plaintiffs. The decision of the Circuit Court of La Salle County is affirmed.

Affirmed.

SCOTT, P. J., and BARRY, J., concur.