No. 2--95--1376

                                                  

                                  IN THE

                        APPELLATE COURT OF ILLINOIS

                              SECOND DISTRICT

RICHARD L. LUCAS, JOHN E.          )  Appeal from the Circuit

HELANDER, and NORMA S. HELANDER,   )  Court of Du Page County.

                                   )

     Plaintiffs-Appellants,        )

                                   )

v.                                 )  No. 93--CH--408

                                   )

DOWNTOWN GREENVILLE INVESTORS      )    

LIMITED PARTNERSHIP,               )  

FINANCIAL SERVICES OF GREENVILLE,  )

INC., SSV SECURITIES, INC.,        )

JOHN T. SNIPES, and OGILVIE AND    )

TAYLOR SECURITIES CORPORATION,     )  Honorable

                                   )  Bonnie M. Wheaton,

     Defendants-Appellees.         )  Judge, Presiding.  

     JUSTICE GEIGER delivered the opinion of the court:

     Richard Lucas, John Helander, and Norma Helander (the plaintiffs) appeal

from the order of the circuit court of Du Page County granting summary judgment

in favor of defendant Ogilvie & Taylor Securities Corporation (Ogilvie).  In

their complaint, the plaintiffs alleged violations of the Illinois Securities Law

of 1953 (the Act) (815 ILCS 5/1 et seq. (West 1994)) and sought rescission of

their purchase of certain units in a limited partnership.  The trial court ruled

that the plaintiffs' action was barred under the applicable statute of

limitations and that any misconduct committed by Ogilvie had been negated by the

plaintiffs' failure to exercise reasonable diligence in deciding to invest in the

subject limited partnership.  The plaintiffs appeal, arguing (1) that the action

was not time-barred, as it had been initiated within three years from the time

the alleged violations were first discovered; and (2) that genuine issues of

material fact existed as to whether the partnership's prospectus contained

material misrepresentations and omissions in violation of the Act.  We affirm in

part, reverse in part, and remand for further proceedings.

     On December 12, 1988, the plaintiffs each signed subscription agreements

for the purchase of units in a limited partnership known as the Downtown

Greenville Investors Limited Partnership (the partnership).  Lloyd DeJong, an

agent for Ogilvie, had recommended the partnership to the plaintiffs as an

investment opportunity.  Lucas purchased one unit in the partnership for $50,000;

the Helanders purchased one-half of a unit for $25,000.  Prior to their

respective purchases of these units, each of the plaintiffs received a private

placement memorandum (PPM), a type of prospectus containing information regarding

the limited partnership and the proposed investment.

     The subject partnership was organized under the laws of the state of South

Carolina, with its principal place of business in Greenville, South Carolina. 

The partnership was formed on September 22, 1988, as a venture between defendants

John T. Snipes and Financial Services of Greenville, Inc.  Defendant SSV

Securities, Inc., a South Carolina corporation, acted in South Carolina as the

partnership's agent and broker for purposes of selling units in the partnership.

     According to the PPM received by the plaintiffs, the partnership's purpose

was to acquire, own, and operate an office building known as the South Carolina

National Bank Building (the building), located in Greenville, South Carolina. 

The building was to be purchased from the U.S. Shelter Corporation for over $6

million.  The partnership property to be purchased was described in the PPM as

follows:

                                 "The Partnership Property consists of an [sic] nine-story office

     building known as the South Carolina National Bank Building, containing

     approximately 166,000 square feet of gross area and 150,000 square feet of

     leasable area, along with certain small adjoining lots consisting of

     several smaller buildings which the partnership proposes to demolish for

     the purpose of creating a "green space" adjoining the office building. 

     The Partnership will be purchasing a leasehold interest in the real

     property where the building is located and a fee interest (legal title) in

     the adjoining lots from which the "Green Space" will be created.  The

     contract of sale also requires seller to negotiate an option to purchase

     the leasehold interest and assign that to the Partnership."  (Emphasis

     added.)

     The plaintiffs believed that the underscored sentence required U.S. Shelter to

negotiate an option to purchase the land on which the building stood and that the

option would be assigned to the partnership at the time of closing.

     An engineering report authored by Michael Crowe, P.E., and dated September

23, 1988, was attached to the PPM received by the plaintiffs.  The report had

been completed after an inspection of the building was conducted by various

engineers with backgrounds in structures, electrical, piping, heating,

ventilation, and air conditioning.  The report concluded that the building was

structurally, electrically, and mechanically sound and that it had been "very

well maintained over its life of approximately 14 years."  The report, which

outlined specific problem areas on each floor of the building, disclosed no major

problems relating to the eighth and ninth floors of the building.

     On February 1, 1989, the partnership advised the plaintiffs that it had

successfully acquired the building.  The partnership, however, did not disclose

whether it had acquired an option to purchase the land under the building.

     In a letter dated March 2, 1992, Snipes advised the plaintiffs that the

partnership was in a "difficult" financial condition.  Snipes indicated that a

group of California investors had declined to make their final installment of

approximately $200,000 because the partnership had failed to secure an option to

purchase the land under the building.  In his letter, Snipes indicated that the

partnership had, in fact, acquired the option, but he did not indicate when the

option had been purchased or whether the option would be exercised.  Snipes

explained that, due to the partnership's poor financial condition, a capital call

of $750,000 might be necessary from the partners.  The plaintiffs assert that it

was not until they received this letter that they learned that the partnership

had not secured an option to purchase the land at the time of closing.

     In a letter dated July 15, 1992, Ogilvie informed the plaintiffs that it

had been unsuccessful in its attempt to secure Alan LeVow as a replacement

general partner.  A report authored by Alan LeVow, which detailed the multitude

of problems associated with the building, was attached to Ogilvie's letter.  Of

particular concern to LeVow was the deteriorating physical condition of the

building.  Levow's report stated:

                                 "The physical condition of the [building] is poor.  The [heating,

     ventilation and air conditioning] system makes so much noise and vibrates

     so significantly that it is literally impossible to lease the top two

     floors of the building, floors 8 and 9.  Not surprisingly, these two

     floors have never been occupied in the 18 years in which the building has

     been opened.  The building manager indicated that it would cost anywhere

     between $100,000 to $250,000 to correct the noise and ventilation

     problems. ***

                              * * *

                                        The building manager also informed me that the building did not meet

     fire and elevator codes.  In fact, she has been on notice for

     approximately two years from different government officials about the code

     violations.  She estimates it will take approximately $120,000 to bring

     the building up to code.  She is concerned that if this is not acted upon

     soon the building could be closed."

     It was not until the receipt of this letter that the plaintiffs became aware of

the poor physical condition of the building and the difficulty in leasing the

eighth and ninth floors.  Indeed, based on the engineering report which the

plaintiffs received at the time of their initial subscription, they believed that

the building was in good structural and mechanical condition.

     On October 20, 1992, plaintiff Lucas notified the general partners of his

election to rescind his purchase in the partnership and demanded a refund of his

$50,000 investment, with interest.  On December 1, 1992, the Helanders also

notified the general partners of their election to rescind their purchase in the

partnership and demanded a refund of their $25,000 investment, with interest. 

The partnership refused to honor the plaintiffs' rescission election.

     On April 28, 1993, the plaintiffs filed a six-count complaint against the

partnership, as well as Financial Services of Greenville, Inc., SSV Securities,

Inc., Snipes, and Ogilvie.  Counts I, III, and V of the complaint were brought

on behalf of Lucas, and identical Counts II, IV, and VI were brought on behalf

of the Helanders.  Counts I and II alleged that all of the defendants had

violated sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through

(I) (West 1994)), by making material misrepresentations and omissions in the PPM

regarding the land purchase option and the building's physical condition and

leasing history.  Counts III and IV were directed against Snipes, the

partnership, and Financial Services of Greenville, alleging that they

fraudulently induced the plaintiffs to purchase their respective partnership

interests.  Counts V and VI were directed against Snipes and Financial Services

of Greenville, alleging an action for breach of fiduciary duty.

     On July 8, 1993, the trial court entered default judgments against Snipes,

the partnership, and Financial Services of Greenville.  The trial court

subsequently entered money judgments in favor of the plaintiffs against these

defendants.

     On November 4, 1993, the plaintiffs filed an amended complaint.  Counts I

and II of the amended complaint alleged that Ogilvie, acting through its agent,

Lloyd DeJong, was involved in the business of offering, selling, dealing,

trading, and marketing the units of the subject limited partnership.  The

plaintiffs alleged that they each received a copy of the PPM, which contained the

misrepresentations and omissions described above.  The plaintiffs alleged that

they relied on the information contained in the PPM and would not have purchased

an interest in the partnership had they known of the misrepresentations and

omissions contained therein.  The plaintiffs alleged that Ogilvie's conduct

violated sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through

(I) (West 1994)) and sought rescission of their purchase of units in the

partnership, return of their original investment, plus interest and attorney

fees.

     On July 17, 1995, Ogilvie filed a motion for summary judgment as to Counts

I and II of the amended complaint.  Ogilvie alleged that the plaintiffs could not

establish any material misrepresentations or omissions contained within the PPM

that were actionable under the Act.  Specifically, Ogilvie argued that the

language contained in the PPM was accurate, in that it disclosed that the

partnership would only have a leasehold interest in the building and was merely

attempting to negotiate an option to purchase the land.  Ogilvie also argued that

had the plaintiffs exercised reasonable diligence, they would have discovered the

leasing problems associated with the building's ventilation system.

     Ogilvie also argued that it was entitled to summary judgment because the

plaintiffs could not establish that the alleged misrepresentations or omissions

contained within the PPM proximately caused their financial loss.  Ogilvie argued

that proximate causation was a requisite element under the Act and that the

plaintiffs were unable to make the appropriate showing.  Ogilvie also argued that

Counts I and II of the amended complaint were time barred under the Act's

limitations provision (815 ILCS 5/13(D) (West 1994)), as the action was not

brought within three years from the date the securities were purchased.

     In response to the motion for summary judgment, the plaintiffs argued that

genuine issues of material fact existed as to whether the PPM misrepresented the

partnership's ability to purchase the land under the building.  Furthermore, the

plaintiffs argued that the PPM contained material omissions because it did not

disclose the problems associated with the top two floors of the building.  In

support of their arguments, the plaintiffs offered the affidavit of Tony Barnett,

who had been the building's superintendent since it opened in 1974.  In his

affidavit, Barnett stated that the building's eighth and ninth floors had been

vacant, for the most part, since the building had been opened.  He stated that

the floors had not been leased because of the noise associated with the air

conditioning system.  The plaintiffs also relied on Alan LeVow's report of July

14, 1992, which also stated that the top two floors had not been leased because

of the noisy ventilation system.

     In response to Ogilvie's other arguments, the plaintiffs argued that the

Act did not require a showing of loss causation as the only remedy available to

them under the Act was rescission and the return of their original investment. 

The plaintiffs also argued that the action was properly brought within the three-

year limitations period, as they did not have knowledge of the alleged

misrepresentations and omissions until 1992, when they had received the letters

of Snipes and LeVow.

     Following a hearing on the motion, the trial judge granted Ogilvie's motion

for summary judgment as to Counts I and II of the plaintiffs' amended complaint. 

Relying on this court's holding in Lagen v. Balcor Co., 274 Ill. App. 3d  11, 18-

20 (1995), the trial court ruled that the existence of extensive cautionary

language in the PPM negated the materiality of any misrepresentations or

omissions contained therein.  The trial judge also held that the three-year

statute of limitations applied and that, as a matter of law, the plaintiffs

failed to exercise reasonable diligence once they became aware of the violations. 

The plaintiffs filed a timely notice of appeal.

     The plaintiffs' first argument on appeal is that genuine issues of material

fact existed as to whether the alleged misrepresentations and omissions

constituted a violation of the Act.  A motion for summary judgment should be

granted only when the pleadings, depositions, and admissions on file, together

with affidavits, if any, disclose that there is no genuine issue of material fact

and that the moving party is entitled to judgment as a matter of law. 

Bolingbrook Equity I Limited Partnership v. Zayre of Illinois, Inc., 252 Ill.

App. 3d 753, 764 (1993).  In determining whether a moving party is entitled to

summary judgment, the court must construe the pleadings, depositions, admissions,

and affidavits strictly against the movant and liberally in favor of the

opponent.  Saladino v. Team Chevrolet, Inc., 242 Ill. App. 3d 735, 739-40 (1993). 

Summary judgment should be granted only when the right of the moving party is

clear and free from doubt.  Graf v. St. Luke's Evangelical Lutheran Church, 253

Ill. App. 3d 588, 591 (1993).

     In their amended complaint, the plaintiffs allege that Ogilvie violated

sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through (I) (West

1994)).  These sections proscribe the following conduct:

                                 "F.  To engage in any transaction, practice or course of business in

     connection with the sale or purchase of securities which works or tends to

     work a fraud or deceit upon the purchaser or seller thereof.

                                 G.  To obtain money or property through the sale of securities by

     means of any untrue statement of a material fact or any omission to state

     a material fact necessary in order to make the statements made, in the

     light of the circumstances under which they were made, not misleading.

                                 H.  To sign or circulate any statement, prospectus, or other paper

     or document required by any provision of this Act knowing or having

     reasonable grounds to know any material representation therein contained

     to be false or untrue.

                                 I.  To employ any device, scheme or artifice to defraud in

     connection with the sale or purchase of any security, directly or

     indirectly."  815 ILCS 5/12(F) through (I) (West 1994).

     We note that in their appellate brief, the plaintiffs have withdrawn any claimed

violation of section 12(H).  Therefore, we will not consider any such violation

here.

     The provisions of sections 12(F) and (G) of the Act are patterned after

sections 17(a)(2) and (a)(3) of the Securities Act of 1933 (Federal Securities

Act) (15 U.S.C. §§77q(a)(2), (a)(3) (1988)), and Illinois courts must therefore

look to federal case law when interpreting these provisions.  Foster v. Alex,

213 Ill. App. 3d 1001, 1005 (1991).  In order to determine whether a

misrepresentation or omission is material for purposes of the Federal Securities

Act, federal courts consider whether a reasonable and prudent investor would

attach importance to the fact omitted or misrepresented in determining his

choice of action in the transaction in question.  See In re Donald J. Trump

Casino Securities Litigation--Taj Mahal Litigation, 7 F.3d 357, 369 (3d Cir.

1993).  Materiality is a mixed question of law and fact which is ordinarily left

for the jury to determine; therefore, summary judgment is only proper in

instances where the alleged misrepresentations or omissions are so obviously

unimportant that reasonable minds could not differ as to the question of their

materiality.  TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450, 48 L.

Ed. 2d 757, 766, 96 S. Ct. 2126, 2133 (1976).

     The plaintiffs argue that the representations contained in the PPM

regarding the land purchase option were misleading and untrue, in violation of

sections 12(F), (G), and (I) of the Act.  As noted above, the plaintiffs

specifically complain of the following statement in the PPM:

     "The contract of sale also requires seller to negotiate an option to

     purchase the leasehold interest and assign that to the Partnership."

     The plaintiffs argue that this statement was a material misrepresentation because

the partnership had not, at the time of closing, obtained any legally

recognizable option to purchase the land.

     We agree with the trial court that these allegations were barred under the

three-year limitations period provided in section 13(D) of the Act.  That

provision states:

                                 "No action shall be brought for relief under this Section *** after

     3 years from the date of sale; provided, that if the party bringing the

     action neither knew nor in the exercise of reasonable diligence should

     have known of any alleged violation of subsection E, F, G, H, I or J of

     Section 12 of this Act which is the basis for the action, the 3 year

     period provided herein shall begin to run upon the earlier of:

                                 (1) the date upon which the party bringing such action has actual

     knowledge of the alleged violation of this Act; or

                                 (2) the date upon which the party bringing such action has notice of

     facts which in the exercise of reasonable diligence would lead to actual

     knowledge of the alleged violation of this Act; but in no event shall the

     period of limitation so extended be more than 2 years beyond the

     expiration of the 3 year period otherwise applicable."  815 ILCS 5/13(D)

     (West 1994).

     The securities at issue in the instant case were purchased on December 12, 1988. 

Therefore, under the statutory language noted above, the limitations period for

bringing an action expired on December 12, 1991.  The instant suit, however, was

not filed until April 28, 1993.

     The plaintiffs argue that under section 13(D)(1), the limitations period

did not begin to run until they had actual knowledge of the alleged

misrepresentation regarding the land purchase option.  They argue that they did

not receive such knowledge until they received Snipes' letter of March 2, 1992,

which disclosed that the partnership had not acquired an option to purchase the

land at the time of closing.

     Pursuant to section 12(D)(2), however, the limitations period begins to run

on the date that the party has notice of certain facts, which upon the exercise

of reasonable diligence, would result in actual knowledge of the violation.  In

the instant case, the plaintiffs' alleged understanding regarding the land

purchase option was inconsistent with the remainder of the PPM, which stated that

the partnership would not have any ownership interest in the land.  For example,

the PPM contained the following statements:

     "The Partnership will be purchasing a leasehold interest in the real

     property where the building is located and a fee interest (legal title) in

     the adjoining lots from which the "Green Space" will be created.

     * * *

                                     The property upon which the building is situated is owned by South

     Carolina National Bank and is subject to a lease which will be assigned to

     the Partnership which expires in 2018."  (Emphasis added.)

     Given the inconsistency between these statements and the plaintiffs' belief that

the partnership would be obtaining a land purchase option,  the plaintiffs were

certainly put on notice of a potential ambiguity contained within the PPM.  Had

the plaintiffs exercised reasonable diligence after discovering this ambiguity,

they would have learned of the status of the land purchase option and whether

there had been any actual misrepresentation.

     Moreover, we are not convinced that the PPM statement on which the

plaintiffs rely actually required the partnership to obtain a land purchase

option.  That statement reads:

     "The contract of sale also requires seller to negotiate an option to

     purchase the leasehold interest and assign that to the Partnership."

     Nowhere in this statement is there any reference to an option to purchase the

land under the building; rather, the statement refers to an option "to purchase

the leasehold interest."  The plaintiffs provide no explanation or authority for

their interpretation that an option to purchase the leasehold interest is the

same thing as an option to purchase the land.  Even assuming that these two terms

have the same meaning, the statement presents further ambiguity, as it does not

specify whether the option had to be secured prior to the time of closing, nor

does it specify whether the deal could proceed without obtaining the option.  We

therefore find that the statement was sufficiently ambiguous and vague so as to

put  the plaintiffs on notice of a potential violation at the time they received

the PPM.  Pursuant to section 13(D)(2) of the Act, the limitations period thus

began to run in December 1988, when the plaintiffs received the PPM and purchased

the partnership units.  Therefore, the limitations period for bringing this claim

expired in December 1991, approximately two years prior to the time the instant

suit was filed.

     The plaintiffs next argue that a genuine issue of material fact exists as

to whether Ogilvie's failure to disclose the noise problem associated with the

top two floors of the building was a material omission in violation of sections

12(F), (G), and (I) of the Act.  We agree.  At the time of subscription, the

plaintiffs were provided an engineering report which described the building's

condition as being structurally, electrically, and mechanically sound.  The

report, which specifically detailed the various problem areas on each floor of

the building, disclosed no noise problem associated with the heating and air

conditioning system on the top two floors of the building, nor did the PPM

disclose any leasing difficulties caused by the noise on these two floors.  The

plaintiffs, however, presented evidence in the form of Alan LeVow's July 14,

1992, report, as well as the affidavit of building manager Tony Barnett, which

demonstrated that these problems had been both longstanding and severe.  Contrary

to Ogilvie's contentions, we believe that such evidence may be properly

considered pursuant to Supreme Court Rule 191(a) (145 Ill. 2d R. 191(a)).  See

Mount Prospect State Bank v. Forestry Recycling Sawmill, 93 Ill. App. 3d 448,

459-60 (1980).

     As set forth above, the standard for determining materiality for purposes

of a violation of the Act is whether there is a substantial likelihood that a

reasonable investor would consider the omitted material to be important in

deciding how to invest.  Trump, 7 F.3d at 369.  In deciding whether to invest in

a piece of real property, there is a substantial likelihood that a reasonable

investor would consider information relating to the building's physical condition

and past leasing history to be important investment considerations.  In light of

the evidence presented above, we conclude that a jury could reasonably determine

that the plaintiffs were misled about the leasing problems associated with the

building's noisy ventilation system and that such information would have had a

significant impact on their decision to invest.

     Relying on this court's decision in Lagen v. Balcor Co., 274 Ill. App. 3d

11, 18-20 (1995), the trial court concluded that the materiality of the alleged

omissions was negated by the extensive cautionary language contained in the PPM. 

In Lagen, the plaintiff alleged violations of the Consumer Fraud and Deceptive

Practices Act (815 ILCS 505/2 (West 1992)) predicated upon misleading and false

statements made in the PPM regarding the past performance of the security and the

likelihood of future returns.  Lagen, 274 Ill. App. 3d at 18.  This court

dismissed the action after noting that the PPM was replete with cautionary

language warning potential investors of the risks attendant to ownership of real

property, including changes in local governmental rules and fiscal policies,

economic conditions, neighborhood values, tenant turnover, competition,

shortages, and increased energy costs.  Lagen, 274 Ill. App. 3d at 19.  In view

of these warnings, this court held that any allegedly false statements of fact

were " 'accompanied by meaningful cautionary statements' which rendered reliance

on those facts immaterial as a matter of law."  Lagen, 274 Ill. App. 3d at 20,

quoting Trump, 7 F.3d at 371.

     Our decision in Lagen was predicated upon the "bespeaks caution" doctrine,

which has been developed in a line of federal securities cases.  See Trump, 7

F.3d at 371-72; In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1414

(9th Cir. 1994); In re Integrated Resources Real Estate Ltd. Partnerships

Securities Litigation, 850 F. Supp. 1105, 1141 (S.D.N.Y. 1993).  The "bespeaks

caution" doctrine stands for the proposition that statements made in securities

offerings must be analyzed in context.  Worlds of Wonder, 35 F.3d at 1414.  Thus,

cautionary language, if sufficiently substantive and specifically tailored to the

projections, estimates, and opinions contained in an offering document, can

render alleged misrepresentations and omissions immaterial as a matter of law. 

Trump, 7 F.3d at 371-72.

     Our review of the "bespeaks caution" doctrine leads us to conclude that it

is not applicable in the instant case.  As articulated by the federal courts, the

doctrine applies only to misstatements relating to economic projections,

estimates of future performance, and similar optimistic statements contained in

the prospectus.  Worlds of Wonder, 35 F.3d at 1413.  The misrepresentations

contained in Lagen and the federal cases noted above generally consisted of

statements relating to promises of future performance.  As the cautionary

language used in those cases was specifically tailored to the future projections,

estimates, and opinions contained in the PPMs, those courts concluded that there

had been no actionable misrepresentations.

     In the instant case, however, the omissions did not relate to opinions or

estimates of future performance, but instead related to an important piece of

information relating to the building itself.  None of the cautionary language

contained in the subject PPM warned the plaintiffs that the engineering reports

with which they were provided were inaccurate; nor do we believe that the

plaintiffs were under an obligation to travel to South Carolina to ascertain the

report's accuracy.  The objective of the Act is to protect innocent persons who

may be induced to invest their money in speculative enterprises over which they

have little control, and the Act must be liberally construed to better protect

the public from deceit and fraud in the sale of securities.  Meihsner v. Runyon,

23 Ill. App. 2d 446, 456 (1960).  We therefore conclude that a jury should

determine the materiality of the omission and whether there has been a violation

of the Act.

     Ogilvie argues that summary judgment was proper in the instant case because

the plaintiffs presented no evidence that the alleged misrepresentations and

omissions proximately caused their losses.  Ogilvie argues that a showing of

proximate causation is required under the Act and that the plaintiffs' failure

to allege and prove this element mandates the entry of judgment on Ogilvie's

behalf.  The plaintiffs argue that they are not required to allege and prove

proximate causation, as it is not a statutorily required element under the Act.

     Although no Illinois court has addressed this precise issue, several

federal courts have discussed the question of proximate causation in the context

of the Federal Securities Act.  These courts have made a distinction between

"transaction causation" and "loss causation."  See Bastian v. Petren Resources

Corp., 892 F.2d 680, 683-84 (7th Cir. 1990); LHLC Corp. v. Cluett, Peabody & Co.,

842 F.2d 928, 931 (7th Cir. 1988).  "Transaction causation" concerns whether the

alleged misconduct induced the plaintiff to purchase the security in the first

instance; "loss causation" concerns whether the plaintiff would have suffered a

financial loss if the facts were what he believed them to be.  LHLC, 842 F.2d at

931.  The focus in these federal cases has been whether the plaintiff must allege

and prove both "transaction causation" and "loss causation" in order to assert

a claim under the Federal Securities Act.

     At the very least, the Act's statutory language requires a showing of

"transaction causation."  Section 12(F) forbids engaging in the sale of a

security "which works or tends to work a fraud or deceit upon the purchaser or

seller thereof."  815 ILCS 5/12(F) (West 1994).  Section 12(G) forbids the

gaining of money through the sale of a security "by means of any untrue statement

of a material fact or any omission to state a material fact."  815 ILCS 5/12(G)

(West 1994).  Section 12(I) forbids the employment of any scheme or artifice to

defraud "in connection with the sale or purchase of any security."  815 ILCS

5/12(I) (West 1994).  The plaintiffs do not dispute they are under a burden to

show "transaction causation," and, as we have already discussed, they have

sufficiently met this burden in regard to the noisy ventilation system so as to

preclude summary judgment.  Therefore, we will turn our attention to the question

of whether plaintiffs must show "loss causation."

     The United States Court of Appeals for the Seventh Circuit has held that

a plaintiff is required to prove both "transaction causation" and "loss

causation" in order to bring an action under Rule 10b-5 of the Securities and

Exchange Commission (SEC) (17 C.F.R. §240.10b-5 (1996); 15 U.S.C. §78j (1991)). 

Bastian, 892 F.2d at 686.  In Bastian, the court affirmed the dismissal of a Rule

10b-5 claim due to the plaintiffs' failure to plead loss causation, commenting:

                                 "The plaintiffs alleged that they invested in the defendants'

     limited partnerships because of the defendants' misrepresentations, and

     that their investment was wiped out.  But they suggest no reason why the

     investment was wiped out.  They have alleged the cause of their entering

     into the transaction in which they lost money but not the cause of the

     transaction's turning out to be a losing one."  (Emphasis in original.) 

     892 F.2d at 684.

     The Bastian court explained that when an investment fails due to a cause other

than the alleged misrepresentation, such as an economic downturn, "the

plaintiffs, given their demonstrated desire to invest in such ventures, lost

nothing by reason of the defendants' fraud and have no claim to damages." 

Bastian, 892 F.2d at 685.  The policy underlying this rule of law is that there

is "[n]o social purpose [to] be served by encouraging everyone who suffers an

investment loss because of an unanticipated change in market conditions to pick

through offering memoranda with a fine-tooth comb in the hope of uncovering a

misrepresentation."  Bastian, 892 F.2d at 685.

     Relying on Bastian, Ogilvie argues that a similar rule should be applied

to actions brought under the Act and that the plaintiffs should be required to

prove "loss causation."  The plaintiffs, however, argue that Bastian is

inapplicable to the instant case due to the statutory differences between Rule

10b-5 and the Act.  While Rule 10b-5 has been interpreted to provide plaintiffs

a private right of action for damages based on common-law fraud and tort

(Bastian, 892 F.2d at 683), the only cause of action provided under the Act is

for rescission (815 ILCS 5/13 (West 1994)).  Since the rescission remedy provided

by the Act is statutory, rather than predicated on common-law tort, the

plaintiffs argue that the Act does not require a showing of "loss causation."

     As Ogilvie notes, the language of section 12 of the Act closely parallels

the language of Rule 10b-5 (Norville v. Alton Bigtop Restaurant, Inc., 22 Ill.

App. 3d 273, 279 (1974)).  Both provisions cover the same violations and seek to

protect innocent investors who are induced to invest in highly speculative

securities.  See Norville, 22 Ill. App. 3d at 280.  We note, however, that the

remedies provided by the two provisions are not the same.  Norville, 22 Ill. App.

3d at 280.  In Bastian, the Seventh Circuit noted that Rule 10b-5 is not a

complete scheme for remedying securities fraud; although the rule details what

conduct is proscribed, it does not provide a statutory cause of action or right

to damages for its violation.  Bastian, 892 F.2d at 683.  Due to this lack of a

statutory cause of action and remedy, federal courts have interpreted Rule 10b-5

to impliedly authorize the creation of a federal common-law action for securities

fraud akin to that of common law fraud.  Superintendent of Insurance v. Bankers

Life & Casualty Co., 404 U.S. 6, 13 n.9, 30 L. Ed. 2d 128, 134 n.9, 92 S. Ct.

165, 169 n.9 (1971); Bastian, 892 F.2d at 683.

     Therefore, federal courts have relied heavily on the elements of common-law

fraud and other intentional torts in creating a cause of action under Rule 10b-5. 

Bastian, 892 F.2d at 683.  Because plaintiffs are required to demonstrate proof

of harm (i.e. "loss causation") in order to state an action for common-law fraud,

the federal courts have also required proof of this element for an action

predicated upon a violation of Rule 10b-5.  Bastian, 892 F.2d at 685; Huddleston

v. Herman & MacLean, 640 F.2d 534, 549-50 (5th Cir. 1981); Schlick v. Penn-Dixie

Cement Corp., 507 F.2d 374, 380-81 (2d Cir. 1974).  For this same reason, Rule

10b-5 plaintiffs are entitled to civil damages for conduct that violates the

rule.  Bastian, 892 F.2d at 683.

     Our review of the Act, however, leads us to conclude that it is to be

interpreted and applied in a different manner.  Unlike Rule 10b-5, sections 12

and 13 of the Act provide a complete statutory scheme for determining what type

of conduct is proscribed and what type of remedy is available.  These provisions

expressly provide a statutory cause of action which is distinct from common-law

fraud.  Unlike their federal counterparts, Illinois courts have not interpreted

actions brought under the Act to be based in common-law fraud or tort. 

Furthermore, the only remedy available under the Act is rescission (815 ILCS 5/13

(West 1994)); unlike an action for common law fraud, the Act makes no provision

for damages.  Reshal Associates, Inc. v. Long Grove Trading Co., 754 F. Supp.

1226, 1236 (N.D. Ill. 1990).  As the State legislature has provided a complete

statutory scheme to remedy securities fraud, which is wholly independent of

conventional common law causes of action and remedies, we are bound to give

effect to the plain language of the Act without resorting to other aids for

construction.  See Envirite Corp. v. Illinois Environmental Protection Agency,

158 Ill. 2d 210, 216-17 (1994).

     Section 13(A) of the Act provides that "[e]very sale of a security made in

violation of the provisions of this Act shall be voidable at the election of the

purchaser."  815 ILCS 5/13(A) (West 1994).  Under the Act's plain language, such

a remedy vests at the time the alleged act of misrepresentation, fraud, or deceit

is committed in violation of sections 12(F), (G), and (I).  Hess v. I.R.E. Real

Estate Income Fund, Ltd., 255 Ill. App. 3d 790, 793, 804 (1993).  Sections 12(F),

(G), and (I) contain no statutory requirement that the plaintiffs prove that

Ogilvie's conduct caused the decline in value of their investment and their

corresponding financial loss.  Nor is this court aware of any Illinois case which

has required a plaintiff to prove "loss causation" under the Act or which has

interpreted the Act to be analogous to an action for common-law fraud or tort. 

Lacking any express statutory language or other authority which requires that the

plaintiffs prove "loss causation," we decline to impose such a requirement.

     We also conclude that the three-year limitations provision contained in

section 13(D) does not bar an action predicated upon the building's noisy

ventilation system.  Although the instant action was filed three years after the

purchase of the securities, the limitation period did not begin to run until the

plaintiffs had actual knowledge of the misrepresentations or were otherwise made

aware of facts, which in the exercise of reasonable diligence, would have

resulted in actual knowledge of the violation (see 815 ILCS 5/13(D)(1), (D)(2)

(West 1994)).  The plaintiffs did not have actual knowledge of the omissions

until they received Alan LeVow's report on July 15, 1992; nothing contained in

the PPM or other correspondence received by the plaintiffs would have put them

on notice of the nature and extent of the building's leasing difficulties. 

Therefore, we conclude that the instant action had to be brought on or before

December 12, 1993, the day on which the five-year repose period expired under

section 13(D)(2).  As the original complaint was filed on November 4, 1993, the

allegations contained therein relating to the omissions regarding the building's

physical condition and past leasing history are not time barred.

       For the foregoing reasons, that portion of the order of  the circuit court

of Du Page County granting Ogilvie's motion for summary judgment as to the

allegations regarding the land purchase option is affirmed; that portion of the

order granting Ogilvie's motion for summary judgment as to the allegations

regarding the failure to disclose the building's leasing difficulties is

reversed; and the cause is remanded for further proceedings consistent with this

decision.

     Affirmed in part and reversed in part; cause remanded.

     DOYLE and THOMAS JJ., concur.